**MIKE HOOKS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–181C.

United States Court of Federal Claims.

Sept. 26, 1997.

Douglas L. Patin, Washington, DC, for plaintiff.

Pamela A. Roth, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Scott Barber, U.S. Army, Corps of Engineers, Office of the Chief Counsel, of counsel.

## OPINION

MEROW, Judge.

This is a pre-bid protest in which plaintiff Mike Hooks, Inc. ("Hooks") objects to a solicitation issued by the United States Army Corps of Engineers (the "Corps"). The solicitation seeks bids for the rental of a dredge to perform maintenance dredging in New Orleans Harbor. Hooks alleges that the solicitation is arbitrary and capricious because it favors bidders offering a certain type of dredge in violation of the Corps' duty under the Competition in Contracting Act to "obtain full and open competition." 41 U.S.C. § 253(a)(1)(A) (1994); 10 U.S.C. § 2304(a)(1)(A) (1994). Hooks asks the court to declare the solicitation invalid and enjoin the Corps from proceeding with the procurement until the alleged improprieties are corrected.

The matter is currently before the court on defendant's motion for judgment on the basis of the "administrative record." Plaintiff opposes the motion on the ground that factual issues regarding the propriety of the administrative record as well as substantive factual issues necessitate a trial. No bids have been submitted and the Corps has agreed to postpone the due date for bids pending resolution of this action.

For the reasons stated below, it is determined, based on all of the materials offered by both parties, that there are no genuine issues of material fact and that defendant's motion must be granted as a matter of law.

## BACKGROUND

Unless otherwise stated, the following facts are not in dispute. On December 18, 1996, the New Orleans District of the Corps issued solicitation no. DACW29–97–B–0035 inviting bids for the hourly rental of a manned dredge to perform maintenance dredging in the New Orleans Harbor reach of the Mississippi River. The solicitation allows bidders to offer a 16″ water injection dredge ("WID") or one of seven different sizes of cutterhead dredges ranging from 20″ to 30″. The WID and the cutterheads function quite differently. A cutterhead uses a rotating blade to cut and loosen shoal material on the channel floor. A suction pipe attached to the cutterhead vacuums up the loosened material which is then pumped through a pipeline directly to the disposal site.

In contrast, the WID pumps large amounts of water directly onto the channel floor through orifices along a horizontal pipe. This creates a mixture of water and shoal material which is denser than the surrounding water. The difference in density, or "density gradient," along with gravity, currents, and the slope of the channel bottom cause the mixture to move to deeper waters where it will not interfere with navigation. WID technology was developed in the 1980's by a Dutch corporation and only one company, Gulf Coast Trailing Co. ("Gulf Coast"), is licensed to use the technology in the United States.

Because natural forces rather than pumps and pipelines are used to transport dredged materials, the WID has the potential to be more financially advantageous than the cutterheads. However, the WID often must perform "rehandling," i.e., re-dredging shoal materials which have fallen back to the channel floor prior to reaching sufficiently deep waters. Cutterheads generally do not need to perform rehandling because the dredged materials are transported directly to the disposal area through a pipeline.

The Corps' previous contracts for maintenance dredging in New Orleans Harbor have been performed by cutterhead dredges. The solicitation at issue is the first which allows WID operators (i.e., Gulf Coast) to compete for the work. Hooks, who operates a 24″ cutterhead, performed the last contract for the work awarded by the Corps in 1996 and intends to submit a bid in response to the solicitation.

The solicitation contains eight bid lots, one for each of the eight permissible dredges. Bidders are instructed to complete and submit one lot for the dredge they intend to offer. The lots contain several bidding items but only item 0003, "Dredging," is relevant to

the present dispute.[1] Item 0003 contains the estimated hours of "effective dredging time" each dredge will need to complete the work. The estimates vary considerably from a low of 267 hours for the 30″ cutterhead to a high of 797 hours for the 20″ cutterhead. Both the 16″ WID and the 24″ cutterhead Hooks intends to offer have the same estimated effective dredging time, 553 hours.

To compute its bid price for item 0003, each bidder must specify its proposed hourly rental rate and multiply that rate by the estimated effective dredging hours. "Award will be made to the lowest responsive, responsible bidder, regardless of the bid lot used." Solicitation § 00010 ¶ 2(c). Hence, in order to be competitive, a bidder offering a dredge with a high number of estimated effective dredging hours must bid a low hourly rate.

Effective dredging hours are defined in the solicitation as periods "[w]hen the cutterhead dredge or water injection dredge is operating with the cutterhead/injection head effectively moving material out of the dredging template except rehandling costs." § 01100 ¶ 8(d). A "dredging template" is the specified slope, width, and depth of the dredging area. The contractor must dredge the template, which the Corps will assign after contract award, and dispose of all dredged materials below the –50 foot National Geodetic Vertical Datum ("NGVD") contour in the Mississippi River (i.e., a place in the river more than 50 feet below the waterline).

Effective dredging hours constitute "100% Pay Time Hours," § 01100 ¶ 8(d), meaning that the contractor will be paid at the hourly rate specified in item 0003 for 100% of its effective dredging time, subject to an adjustment described below. Work performed in support of effective dredging (aptly described as "non-effective dredging time") constitutes fractional or 0% pay time. For instance, time spent changing locations or removing debris from the cutterhead or injection head constitutes 70% pay time while time spend in idle standby status constitutes 35% pay time. In addition, and of particular relevance to the present dispute, rehandling is an example of 0% pay time. Solicitation § 01100 ¶¶ 8(b)(2) & (g)(11). Time spent performing non-effective dredging work is multiplied by the appropriate fraction (70%, 35% or 0%) and the contractor is paid for the reduced time at the hourly rate in item 0003.

Although the contractor will be paid at a fractional rate for some non-effective dredging work, the bid lots do not contain an item for such work and the solicitation makes clear that the estimates in item 0003 are estimates of effective dredging time only. § 00010 ¶ 2(a) & (d). Payable non-effective dredging time is simply not an evaluation criterion.

The Corps estimated the effective dredging hours for the different dredges by dividing the estimated total amount of shoal materials to be dredged by the dredges' estimated minimum production rates. Solicitation § 00010 ¶ 2(a). The production rates were estimated by Mr. Edmond Russo, an engineer for the New Orleans District of the Corps, based on "historical dredging data" in the region. § 00010 ¶ 2(b). The estimates vary from a high of 2100 cubic yards of shoal material per hour ("cy/hr") for the 30″ cutterhead to a low of 703 cy/hr for the 20″ cutterhead. § 02482 ¶ 14. Both the 16″ WID and the 24″ cutterhead Hooks intends to offer have the same estimated minimum production rate of 1,013 cy/hr. Id.

The solicitation states that "[d]redging shall be performed at or above the required minimum production rate." § 01100 ¶ 8(b)(1). Prior to award, the low bidder must demonstrate that it can dredge at or above the estimated rate by showing that it met or exceeded that rate "for at least 85 of the total contract duration, on any contracts which are used to prove plant capability, within three years prior to the bid opening date of this solicitation. Failure to establish the dredge's capability to meet the required production rate will result in rejection of the bid as nonresponsive." § 00010 ¶ 5(b).

---

1. The lots also contain items for mobilization and demobilization (item 0001), additional mobilization due to idle standby periods (item 0002), and option items for additional dredging (item 0004) and dredge towing (items 0005 and 0006).

The solicitation provides that the contractor's estimated *minimum production rate* will be used to compute "adjusted" effective dredging time. Effective dredging hours are adjusted for payment by multiplying the number of hours "by the ratio of the actual hourly production rate to the minimum required production rate." § 01100 ¶ 8(j). The actual production rate is defined as "the quantity of cubic yards moved out of the template divided by the time period [*i.e.,* the amount of effective dredging time] required to move the same quantity from the template." § 01100 ¶ 8(b)(2); ¶ 8(j)(1) (actual production rate "shall equal the ratio of the actual quantity of dredged material divided by the actual amount of effective dredging time"). Time spent "re-handling materials moved out of the template to beyond the –50 ft NGVD contour to leave no net increase in materials between the template and the –50–ft NGVD contour will not be considered in actual dredge production rate computation." § 01100 ¶ 8(b)(2). The contractor is paid at the hourly rate for effective dredging hours adjusted in this manner. Thus, the greater the ratio of the actual production rate to the minimum rate, the more the contractor is paid. This scheme rewards the contractor for efficiency and productivity. It also presumes, of course, that the actual and estimated minimum rates measure the same activity.

The solicitation originally provided that bids were due at 2:00 p.m. on January 7, 1997. However, on January 6, 1997, prior to submitting a bid, Hooks filed a protest with the General Accounting Office ("GAO") alleging that the solicitation was improper because, *inter alia,* the estimated production rate for the WID was erroneous and gave an unfair competitive advantage to Gulf Coast. Upon receipt of the protest, the Corps amended the solicitation to postpone the bid-opening date until the protest was resolved. The Corps submitted its report to GAO, Hooks responded and requested a hearing, and the parties each submitted one additional filing. GAO's decision was due on April 16, 1997. However, on March 10, 1997, GAO denied Hooks' request for a hearing and on March 19, 1997, Hooks withdrew its protest.

On March 20, 1997, Hooks filed a complaint in this court asking for a declaration that "the production rate estimate in the subject solicitation for the WID does not provide fair competition between dredges of dissimilar sizes and production rates, is not based upon historical dredging data in the region, and therefore is arbitrary and lacks a rational basis." Complaint at 8. Hooks also requested preliminary and permanent injunctive relief prohibiting the Corps "from advertising or receiving bids pursuant to Solicitation No. DACW29–97–B–0035 with the WID production rates and estimates contained therein." *Id.*

A status conference was held on March 26, 1997. Counsel for defendant stated that the Corps was willing to continue to defer the due date for bids pending resolution of this action. Hence, by order dated March 27, 1997, plaintiff's motion for a preliminary injunction was denied as moot. The parties also expressed differing views regarding what should constitute the "administrative record" for review. The March 27, 1997 order instructed defendant to file the materials underlying the disputed estimates and indicated that plaintiff could inform the court of its objections thereafter.

On April 16, 1997, defendant filed an "Abbreviated Administrative Record" ("AAR") containing the solicitation; data from three projects involving the WID, the Milan Street, Exxon/Baton Rouge, and Calumet Floodgates projects; various reports discussing WID technology and production rates; materials submitted to GAO during Hooks' protest including a February 27, 1997 affidavit from Mr. Russo; and a second affidavit from Mr. Russo dated April 12, 1997 not previously submitted to GAO. On April 29, 1997, defendant filed a status report stating that it intended to file a motion for judgment based on the AAR and the complaint.

On May 1, 1997, plaintiff responded with a status report of its own. Plaintiff questioned the propriety of the AAR and moved for a hearing to identify the proper record for review.

By order dated May 7, 1997, defendant was directed to file its motion since it was determined that the motion would provide

the most appropriate vehicle for addressing the propriety of the AAR as well as the substantive issues raised in the complaint. The order indicated that plaintiff could include its objections to the AAR in its opposition to defendant's motion and stated that the decision reached on the submissions would determine whether further proceedings were required.

On May 23, 1997, defendant filed a "Motion for Judgment on the Basis of the Administrative Record" which is currently before the court. With respect to the propriety of the AAR, defendant asserts that the data from the three projects and the reports discussing the WID are properly included because they were "obtained or considered by the agency in formulating the Solicitation specifications at issue." Def. Mot. at 9. Defendant also asserts that the court is required by statute to include the materials the Corps submitted to GAO in the record. *Id.* Finally, defendant states that Mr. Russo's April 12, 1997 affidavit, which was not submitted to GAO, is properly included in the AAR because it "explain[s] how, in establishing the Solicitation's specifications, the Corps evaluated the raw factual data concerning WID technology and production rates." *Id.* at 10.

On the merits, defendant asserts that "the Milan Street Wharf demonstration project, the Exxon/Baton Rouge project, and the East & West Calumet Floodgates project, along with numerous research papers, provided the Corps with a rational basis for determining the WID production rate in connection with the Solicitation." *Id.* at 12. Defendant also contends that Hooks' allegations in the complaint are based on a misunderstanding of certain concepts underlying the disputed production rate and effective dredging time estimates. *Id.* at 14–17. Defendant concludes that it entitled to judgment as a matter of law. *Id.* at 18.

On July 7, 1997, plaintiff filed its opposition to defendant's motion as well as a "Supplement" to the AAR ("SAAR"). The SAAR contains all of Hooks' submissions to GAO including two affidavits from Mr. Nolan Robichaux, Hooks' vice-president, criticizing the Corps' production rate and effective dredging time estimates for the WID. The SAAR also contains the Corps' GAO filings with attachments which, plaintiff asserts, defendant omitted from the AAR. Plaintiff also filed a "Counter–Statement of Facts and Proposed Additional Facts" with a third affidavit from Mr. Robichaux attached. Presumably, plaintiff would like this document to be included in the record.

In its filings, Hooks spends most of its time attacking the propriety of the AAR. Hooks asserts that Mr. Russo's April 12, 1997 affidavit and certain attachments are improperly included in the AAR because they are "entirely new" and were "not presented to the GAO." Pl. Opp'n at 6. Hooks also states that the Corps' report submitted to GAO relies exclusively on data from the Milan Street project, demonstrating that Mr. Russo did not actually rely on the Exxon/Baton Rouge and Calumet Floodgates projects or the reports included in the AAR. Pl. Counter–Statement of Facts ("PCS") at 2. Hooks concludes that these materials should not be included in the record. *Id.* Similarly, Hooks suggests that the Corps did not obtain many of the materials included in the AAR until after the issuance of the solicitation. *Id.* at 3–5. In support, plaintiff relies on correspondence between Gulf Coast and Mr. Russo indicating that Mr. Russo requested, and Gulf Coast forwarded, data relating to various WID projects as well as certain reports included in the AAR after the solicitation was issued. *Id.* Hooks requests a hearing where "Mr. Russo should be required to specifically identify the documents he had in front of him and actually used to prepare the solicitation." Pl. Opp'n at 7; PCS at 5.

Substantively, Hooks' position is that Mr. Russo actually relied only on data from the Milan Street project in computing the disputed estimates and that issues of material fact regarding the validity of that data require the denial of defendant's motion and a trial on the merits. Pl. Proposed Additional Facts ("PPAF") ¶¶ 7–15; Pl. Opp'n at 3–5.

Defendant filed its reply on July 21, 1997. Therein defendant states that it does not oppose the inclusion of the SAAR in the record—so long as the materials are given "no evidentiary weight." Def. Reply at 5 n. 4. Defendant also reiterates that the data

from the Milan Street, Exxon/Baton Rouge, and Calumet Floodgates projects and the various reports are properly included in the record as evidenced by "the fact that Mr. Russo has sworn, under oath, twice, that he reviewed this material when he prepared the WID specifications." *Id.* at 5 n. 3. Defendant otherwise restates the arguments in its motion.

Oral argument was not requested in the initial briefs, as provided in RCFC Appendix H, and was not deemed necessary given the comprehensive filings by counsel.

## ANALYSIS

### A. Jurisdiction

■ Prior to the passage of the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, 110 Stat. 3870 (1996) ("ADRA"), this court's bid protest jurisdiction was based solely on the theory that "[a]n invitation for bids issued by the government carries, as a matter of course, an implied contractual obligation to fairly and honestly consider all responsive bids." *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 909 (Fed.Cir.1988). This theory allows the court to hear bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491, which confers jurisdiction over "any claim against the United States founded ... upon any express *or implied contract* with the United States." 28 U.S.C. § 1491(a)(1)(1994) (emphasis added). Since the implied contract does not arise until a responsive bid is submitted, prior to the ADRA, the court lacked jurisdiction over actions brought by prospective bidders objecting to the terms of a solicitation. *Ingersoll–Rand Co. v. United States,* 2 Cl.Ct. 373, 376 (1983); *Motorola, Inc. v. United States,* 988 F.2d 113, 114 (Fed.Cir.1993). However, the ADRA amended the Tucker Act to expressly provide the court with "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract." 110 Stat. 3874; 28 U.S.C.A. § 1491(b)(1) (West Supp.1997).

■ Although the term is not defined, defendant does not dispute that Hooks, as a prospective bidder with an economic interest in the outcome of the competition, is an "interested party" within the meaning of the statute. *Cf.* 31 U.S.C. § 3551(2) (1994) (defining "interested party" for purposes of GAO protest as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract *or by failure to award the contract*"); *Cincom Systems, Inc. v. United States,* 37 Fed. Cl. 663, 669–70 (applying and relying on GAO definition of "interested party" in post-award bid protest). Hence, the court possesses jurisdiction to consider Hooks' objections to the solicitation and is authorized to grant an appropriate remedy, "including declaratory and injunctive relief," 28 U.S.C.A. § 1491(b)(2), if those objections prove well founded.

### B. Standard of Review

This action is presently before the court on defendant's motion for judgment on the record pursuant to RCFC 56.1. Such a motion is treated like a motion for summary judgment under RCFC 56(a). *Nickerson v. United States,* 35 Fed. Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997). Defendant's motion will be granted only if there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). A fact is material if it might significantly affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of material fact is genuine if, based on the evidence, a reasonable factfinder could find for the non-movant. *Id.* Defendant, as the moving party, "has the burden of showing the absence of genuine issues as to any material facts." *American Nat'l Bank and Trust Co. v. United States,* 22 Cl.Ct. 7, 12 (1990). Defendant can discharge this burden by showing an absence of evidence to support plaintiff's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If defendant discharges its burden, plaintiff must respond with sufficient evidence to show that there is a material factual dispute and that, on plaintiff's evidence, defendant is not entitled to judgment

as a matter of law. *Seal–Flex, Inc. v. Athletic Track and Court Const.*, 98 F.3d 1318, 1321 (Fed.Cir.1996).

■ When exercising jurisdiction over a solicitation protest, the court is directed to "review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C.A. § 1491(b)(4). The referenced provision, section 10(e) of the Administrative Procedure Act ("APA"), provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1994). This is the identical standard applied in bid protests brought under the implied contract theory. *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 779 (1997); *see, e.g., Prineville* 859 F.2d at 911.

■ Four factors are generally considered to determine whether government action is arbitrary and capricious: "subjective bad faith on the part of the officials; the absence of a reasonable basis for the administrative decision; the amount of discretion entrusted to the procurement officials by applicable statutes and regulations; and proven violation of pertinent statutes or regulations." *Id.; Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203–04 (1974). However, "there is no requirement or implication ... that each of the factors must be present in order to establish arbitrary and capricious action by the government." *Prineville*, 859 F.2d at 911.

■ Hooks has not alleged that the Corps acted in bad faith or abused its discretion in issuing the challenged solicitation. Instead, Hooks asserts that the solicitation is arbitrary and capricious because the production rate estimate and the corresponding effective dredging time estimate for the WID lack a reasonable basis and provide an unfair competitive advantage to Gulf Coast, the only potential bidder who could offer a WID, in violation of the Corps' legal duty to obtain "full and open competition" when soliciting bids and awarding contracts. 41 U.S.C. § 253(a)(1)(A); 10 U.S.C. § 2304(a)(1)(A); 48 C.F.R. § 6.101(b) (1997).

In determining whether there are genuine issues of fact regarding this allegation, the court "should not substitute its judgment for that of the procuring agency and should intervene only when it is clear that the agency's determinations were irrational or unreasonable." *Cincom*, 37 Fed. Cl. at 672. The agency's decision is entitled to a "presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401. U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), but that presumption does not shield the agency's actions from a "thorough, probing, in-depth review." *Id.*

## C.  Scope of Review

■ Judicial review of agency rulemakings and adjudications is generally limited to the "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825–26. The court "should have before it neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Memorial Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C.Cir.1984). Extra-record materials and post-hoc rationalizations should not be considered. "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983). This rule flows from the APA requirement that the court base its review "on the *whole record*." 5 U.S.C. § 706 (emphasis added); *Overton Park*, 401 U.S. at 419, 91 S.Ct. at 825. It has also been held that the rule is a "presumption necessitated by the limited nature of the court's inquiry" under the arbitrary and capricious standard. *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 350 (1997) (*Cubic II* ).

Both parties assume that the on-the-record rule applies in this case even though an objection to a solicitation provision is involved rather than an APA rulemaking or adjudication. This assumption is not necessarily well founded. As stated above, the

arbitrary and capricious standard has consistently been applied in bid protests brought under the implied contract theory, yet the court has not always felt compelled to apply the on-the-record rule. *E.g., Aerolease Long Beach .v. United States,* 31 Fed. Cl. 342, 354–55 (1994) (court engaged in fact finding and recognized "no limitation of review to the administrative record"), *aff'd,* 39 F.3d 1198 (1994); *CACI Field Services, Inc. v. United States,* 12 Cl.Ct. 680, 684 (1987) (the "narrowness of the nature of our review does not foreclose discovery" and protester "has the right to impugn the apparent correctness of [the agency's] decision by collateral evidence"); *Parcel 49C Ltd. Partnership v. United States,* 31 F.3d 1147 (Fed.Cir.1994) (affirming lower court's decision, after trial, to enjoin government's cancellation of solicitation); *Bean Dredging Corp. v. United States,* 19 Cl.Ct. 561, 564–84 (1990) (holding trial); *126 Northpoint Plaza Ltd. Partnership v. United States,* 34 Fed. Cl. 105 (1995) (trial), *appeal dismissed,* 73 F.3d 379 (1995); *Vanguard Security, Inc. v. United States,* 20 Cl.Ct. 90, 111 (1990) (considering *post hoc* justifications of agency action). *But see, e.g., Stapp Towing Inc. v. United States,* 34 Fed. Cl. 300, 307 (1995) ("Generally, when agency action is challenged, judicial review is limited to the administrative record").

Even the district courts, in exercising jurisdiction over post-award bid protests pursuant to the reasoning of *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir. 1970), have departed from the on-the-record rule while applying the APA arbitrary and capricious standard. *E.g., Ulstein Maritime, Ltd. v. United States,* 646 F.Supp. 720 (D.R.I.1986) (conducting trial and making extensive findings of fact), *aff'd,* 833 F.2d 1052 (1st Cir.1987); *Harvard Interiors Mfg. Co. v. United States,* 798 F.Supp. 565 (E.D.Mo. 1992) (conducting trial); *Ralvin Pac. Properties, Inc. v. United States,* 871 F.Supp. 468 (D.D.C.1994) (trial); *see also Smith & Wesson v. United States,* 782 F.2d 1074, 1077 (1st

Cir.1986) (affirming district court's decision, after "full-fledged trial on the merits," to deny plaintiff's request for injunctive relief in pre-award protest). In fact, *Scanwell* itself contemplated that, on remand, the district court would conduct "a full hearing on the merits." 424 F.2d at 873. There is no indication in the ADRA that Congress intended to alter this practice.[2]

In addition, although supplementation is permitted in certain circumstances, the on-the-record rule presupposes that some record exists contemporaneously with the challenged agency decision. *E.g., Camp,* 411 U.S. at 142, 93 S.Ct. at 1244 (review limited to "administrative record *already in existence,* not some new record made initially in the reviewing court") (emphasis added); *Southwest Center for Biological Diversity v. United States Forest Service,* 100 F.3d 1443, 1450 (9th Cir.1996) (review "typically focuses on the administrative record *in existence at the time of the decision* and does not encompass any part of the record that is made initially in the reviewing court") (emphasis added); *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 284 (D.C.Cir.1981) ("review of agency action is normally confined to the full administrative record before the agency *at the time the decision was made*") (emphasis added). In this case, neither Mr. Russo nor the Corps articulated the rationale underlying the disputed estimates at the time they were included in the solicitation or made any contemporaneous "record" of the materials relied on. The solicitation does state that the production rate estimates were "based on historical dredging data in this region," § 00010 ¶ 2(d), but this statement is not an adequate record for judicial review.

■ Though defendant has filed a set of materials it characterizes as the administrative record, permitting the agency or its attorneys to retroactively create a record in

---

2. Likewise, in exercising its new post-award bid protest jurisdiction conferred by the ADRA, the court has acknowledged the on-the-record rule but recognized that "in most bid protests, the 'administrative record' is something of a fiction, and certainly cannot be viewed as rigidly as if the agency had made an adjudicative decision on a formal record that is then certified for court review." *Cubic II,* 37 Fed. Cl. at 350 (1997); *GraphicData,* 37 Fed. Cl. at 780 (1997) ("a judge confronted with a bid protest case should not view the administrative record as a[n] immutable boundary that defines the scope of the case").

this manner is not entirely satisfactory. This practice seems fundamentally incompatible with limiting review to the "administrative record already in existence, not some new record made initially in the reviewing court." *Camp*, 411 U.S. at 142, 93 S.Ct. at 1244. In addition, allowing the agency to retroactively delineate the scope of review may preclude the "substantial inquiry" and "thorough, probing, in-depth review" the court must perform to determine whether the agency's action was arbitrary and capricious. *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. As was noted by the court in *Cubic II*, when a contemporaneous record does not exist,

> the agency has to exercise some judgment in furnishing the court with the relevant documents. In order to preserve a meaningful judicial review, the parties must be able to suggest the need for other evidence, and possibly limited discovery, aimed at determining, for example, whether other materials were considered, or whether the record provides an adequate explanation to the protester or the court as to the basis of the agency action. It follows that discovery as well as the breadth of the court's review has to be tailored in each case.

37 Fed. Cl. at 350; *see also Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir.1980) ("The court cannot adequately discharge its duty to engage in a 'substantial inquiry' if it is required to take the agency's word that it considered all relevant matters"). For these reasons, when a solicitation protest is brought and no meaningful record existed at the time the agency prepared the challenged solicitation provision, it is doubtful that the on-the-record rule applies.[3]

■ However, assuming, as the parties do, that the on-the-record rule applies in this case, all of the materials offered by both parties should be included in the record. Both affidavits of Mr. Russo may be considered because they identify the materials he purportedly relied on and how he computed the disputed estimates. *See Overton Park*, 401 U.S. at 420, 91 S.Ct. at 825–26 ("court may require the administrative officials who participated in the decision to give testimony explaining their action"). These affidavits indicate that, in computing the disputed estimates, Mr. Russo considered data from the Milan Street, Exxon/Baton Rouge, and Calumet Floodgates projects as well as various reports, all of which are included in the AAR.

**3.** When the record of an agency rulemaking or adjudication is inadequate, the preferred option is to remand the matter to the agency for further investigation and explanation. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985). However, a remand in the context of a solicitation protest would be unsatisfactory for the above reasons. For instance, in this case, there are no procedures the Corps would be legally required to follow in creating a record on remand and it is doubtful that the court could impose any. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978) (courts not free to impose upon agencies specific procedural requirements not mandated by APA or other law). As a result, the creation of the record would be entirely at the agency's discretion, and a remand would be no different than simply permitting the agency and its attorneys to retroactively create the record in court. Thus, if the on-the-record rule is deemed mandatory in solicitation protests and the record is inadequate or nonexistent, it may be necessary and within the court's discretion to dismiss the action and require the protester to exhaust its administrative remedies by filing an agency-level protest pursuant to 48 C.F.R. §§ 33.101–33.103 (1997). *See Darby v. Cisneros*, 509 U.S. 137, 153–54, 113

S.Ct. 2539, 2548, 125 L.Ed.2d 113 (1993) ("exhaustion doctrine continues to apply as a matter of judicial discretion" in cases not governed by APA § 10(c), 5 U.S.C. § 704 (1994), which is not applicable here). Exhaustion allows an agency "to develop a complete factual record, to apply its expertise and discretion, and possibly to resolve the conflict without judicial intervention. Exhaustion insures that a court will have the benefit of the agency's experience in exercising administrative discretion as well as a factual record to review." *Joint Bd. of Control of Flathead, Mission and Jocko Irrigation Dists. v. United States*, 862 F.2d 195, 199 (9th Cir.1988) (citation omitted); *McCarthy v. Madigan*, 503 U.S. 140, 145, 112 S.Ct. 1081, 1086–87, 117 L.Ed.2d 291 (1992). These potential benefits apply with respect to agency-level protests since the agency's decision must "be well-reasoned, and shall provide sufficient factual detail explaining the agency position." 48 C.F.R. § 33.103(h). In addition, agency-level protest procedures allow the protester to file a "[d]etailed statement of the legal and factual grounds for the protest" and "[c]opies of relevant documents," 48 C.F.R. § 33.103(d)(2)(iii)-(iv), ensuring that the record will be more complete and provide a more meaningful basis for judicial review than a potentially one-sided record retroactively created by the agency in court or on remand.

Plaintiff maintains that Mr. Russo did not actually consider all of these materials. In support, plaintiff asserts that the agency report filed with GAO references only the Milan Street project. The fact that the Corps chose to refer only to the Milan Street project in its GAO filings, however, is not inconsistent with Mr. Russo's sworn statements that he considered the Exxon/Baton Rouge and Calumet Floodgates projects. Hence, plaintiff's assertion provides no basis for excluding these materials from the record.[4]

Plaintiff also claims that the Corps did not obtain certain materials bearing on the WID's production rate until after the issuance of the solicitation. Plaintiff relies on three documents to support this assertion. The first is an undated note from Mr. Russo to Gulf Coast requesting data from a list of certain WID projects performed during 1994–1996. The list does not include the Milan Street, Exxon/Baton Rouge,· or Calumet Floodgates projects which were performed during 1992–1993. Hence, the document does not support plaintiff's contention that Mr. Russo obtained or considered materials relating to these projects only after the issuance of the solicitation.

The second document is a January 7, 1997 letter from Gulf Coast to the Corps containing a list of various WID projects and corresponding production rates. Again, the list does not include the Milan Street, Exxon/Baton Rouge, and Calumet Floodgate projects. Nonetheless, plaintiff asserts that data relating to these three projects as well as several reports included in the AAR were attached to the letter, suggesting that the Corps did not obtain them until after the solicitation was issued. Even if this assertion is true, however, the mere fact that Gulf Coast sent copies of materials to Mr. Russo after the solicitation was issued does not lead to the conclusion that Mr. Russo did not consider all three projects in computing the disputed estimates, as he states in his sworn affidavits.

Finally, Hooks relies on a February 27, 1997 memorandum from Gulf Coast to Mr. Russo responding to certain questions Mr. Russo posed about the Exxon/Baton Rouge and Calumet Floodgates projects. This document merely suggests that Mr. Russo sought clarification regarding the nature of the two projects in order to respond to Hooks' allegations before GAO; it does not suggest that Mr. Russo failed to consider the production rate data from the two projects when he computed the disputed estimates.

Accordingly, there is no basis for excluding from the record the Milan Street, Exxon/Baton Rouge and Calumet Floodgates project data and the reports Mr. Russo states he considered in preparing the disputed estimates.[5]

■ The remaining materials the parties wish to include in the record consist of documents submitted to GAO during Hooks' protest. 31 U.S.C. § 3556 makes clear that in any action in this court

---

**4.** Plaintiff's allegation that Mr. Russo did not consider the Calumet Floodgates project is especially meritless because documents included in plaintiff's SAAR unequivocally demonstrate that Mr. Russo was familiar with the results of this project well prior to the issuance of the solicitation. *E.g.,* SAAR Tab 5 Attach. A (July 22, 1996 draft memorandum from Mr. Russo discussing Calumet Floodgates project). This is not surprising since the project was performed by Gulf Coast in 1993 for the New Orleans District of the Corps, Mr. Russo's employer since 1991.

**5.** Furthermore, even if factual issues existed regarding whether data from the three projects and the reports included in the AAR were before Mr. Russo's mind's eye when he computed the disputed estimates, a trial to resolve the issues would be unwarranted. All of these materials support the disputed estimates. Thus, even if the court decided after a trial to exclude some of the materials and subsequently ruled in plaintiff's

favor on the merits, the Corps could simply reissue the same solicitation—this time with a contemporaneous "record" justifying the disputed estimates on the basis of the excluded materials. Neither the court nor the parties should have to waste scarce time and resources participating in such a futile proceeding. *Cf. Ward v. Merit Systems Protection Bd.,* 981 F.2d 521, 528 (Fed.Cir. 1992) (where "'it is clear that ... the agency would have reached the same ultimate result, we do not improperly invade the administrative province by affirming'") (quoting *Salt River Project Agric. Improvement & Power Dist. v. United States,* 762 F.2d 1053, 1061 n. 8 (D.C.Cir.1985)). In addition, such a proceeding would be inconsistent with the statutory mandate that, in exercising jurisdiction over solicitation protests, the court "give due regard to ... the need for expeditious resolution of the action." *28 U.S.C.A.* § 1491(b)(3).

based on a procurement or proposed procurement with respect to which a[GAO] protest has been filed under this subchapter, *the reports required by section 3553(b)(2)* and 3554(e)(1) of this title with respect to such procurement or proposed procurement and any decision or recommendation of the Comptroller General ... *shall be considered to be part of the agency record subject to review.*

31 U.S.C. § 3556 (1994) (emphasis added).[6] Hence, the Corps' February 5, 1997 report submitted to GAO in accordance with § 3553(b)(2) must be considered part of the record. In addition, the Corps' February 28, 1997 response to Hooks' comments on the report should be considered part of the record since it is essentially no more than an extension of the agency report. Both of these documents, however, and all of the attachments (except the affidavits, project data, and reports discussed above) will be viewed "not as evidence, but as argument. Their only potential utility, other than as a key to the agency record, is to demonstrate what issues were raised or not raised at the GAO." *Cubic Applications, Inc. v. United States,* 37 Fed. Cl. 339, 344 (1997) (*Cubic I* ).

■ Likewise, Hooks' January 6, 1997 protest, its February 18, 1997 comments on the agency report, and its March 7, 1997 GAO filing will be considered argument for the record because these materials illuminate the nature of the contentions made during the protest and will be innocuous since they too will not be given evidentiary weight. *Cf. Id.* (protester's submissions to GAO included in record to give GAO's decision context).

Finally, the three affidavits from Mr. Robichaux which plaintiff has submitted to the court, including two which were submitted to GAO and one attached to the Counter–Statement of Facts and Proposed Additional Facts, will be considered evidence supplementing the record because they help explain the highly technical nature of the issues and discuss factors which the Corps perhaps should have considered but did not. *Esch v.*

*Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989) (supplementation of administrative record permitted "when the agency failed to consider factors which are relevant to its final decision" and "when a case is so complex that a court needs more evidence to enable it to understand the issues clearly") (citation omitted); *GraphicData,* 37 Fed. Cl. at 779 (same); *Cubic I,* 37 Fed. Cl. at 342 (same).

Thus, all of the materials offered by both parties are within the scope of the court's review even if the on-the-record rule applies.

### D. Merits

■ Defendant asserts that it is entitled to judgment in its favor because data from the Milan Street, Exxon/Baton Rouge, and Calumet Floodgates projects as well as the other materials in the AAR demonstrate the reasonableness of the production rate and effective dredging time estimates for the WID.

The Milan Street project was performed by Gulf Coast's WID on June 25–26, 1992 as a demonstration for the Corps. The dredging site was located in the Milan Street Wharf area of New Orleans Harbor. The dredging conditions in that area are very similar to the conditions in the area to be dredged pursuant to the proposed contract.

Since the project was only a demonstration, Gulf Coast did not attempt to dredge a specific template. Rather, the aim of the project was simply to demonstrate the WID's ability to dredge shoal materials in a area similar to the dredging area described in the solicitation. Before and after hydrographic surveys of the area dredged show that the WID removed 13,432 cy of shoal materials during 7.5 hours of effective dredging. The WID also spent approximately 4.5 hours performing non-effective dredging work for a total project completion time (labeled "service hours" in the reports) of twelve hours. Thus, the WID's production rate for the project was 1,790.93 cy/hr when computed on the basis of effective dredging time (13,432 cy/7.5

---

**6.** Section 3553(b)(2) provides that an agency must file with GAO "a complete report (including all relevant documents) on the protested procurement." 31 U.S.C. § 3553(b)(2) (1994). The report required by § 3554(e)(1), which must be

prepared when an agency "fails to implement fully a recommendation of the Comptroller General," 31 U.S.C. § 3554(e)(1) (1994), is not relevant here.

hr) and 1,119.33 cy/hr when computed on the basis of service hours (13,432 cy/12 hr).[7] The surveys also show that, while some of the dredged material was carried below the –50 ft NGVD because of the steep slope and high currents in the area, a substantial amount fell back to the channel floor above that level. Hence, the WID would have had to perform a considerable amount of rehandling if it had been required to dispose of all materials below the –50 ft NGVD. The Corps estimated that the WID would have had to rehandle 40% of the materials dredged.

The Exxon/Baton Rouge project was performed by Gulf Coast's WID for Exxon Corporation on June 17–22, 1992, just prior to the Milan Street project. The WID dredged the area on the inside of Exxon's docks bordering the Mississippi River in Baton Rouge, Louisiana. The dredging conditions in the area are also very similar to the conditions in the dredging area described in the solicitation.

In contrast to the Milan Street project, the undisputed evidence suggests that the Exxon/Baton Rouge project did require Gulf Coast's WID to dredge a specific template. AAR Tab 15 ¶ 5, Tab 5 at 7; SAAR Tab 5 Ex. F. Before and after hydrographic surveys of the area dredged show that the WID removed 66,227 cy of shoal material during 51 hours of effective dredging and 64.75 service hours. Hence, the WID's production rate for the project was approximately 1,300 cy/hr when computed on the basis of effective dredging hours and 1,022 cy/hr when computed on the basis of service hours.[8]

Finally, the Calumet Floodgates project was performed by Gulf Coast for the New Orleans District of the Corps on December 28–30, 1993. This was the first commercial dredging contract awarded by the New Orleans District to a WID. The conditions at the Morgan City, Louisiana project area were much more suitable for the WID than the conditions in the Milan Street and Exxon/Baton Rouge project areas and the dredging area described in the solicitation.

It is not clear whether the project required the WID to dredge a specific template. The record indicates that the WID was required to dredge both floodgates to a navigable depth of 9.0 feet and to dispose of the dredged material on a slope in a nearby outlet or below the –30 ft NGVD. AAR Tab 4 at 1. Project reports indicate that the WID dredged 23,234 cy of shoal materials from the floodgates during 16.25 hours of effective dredging and 5.25 hours of non-effective dredging. Thus, the WID's production rate was 1,430 cy/hr when computed on the basis of effective dredging time and 1,080 cy/hr when computed on the basis of service hours.

The WID's production rates for the three projects described above clearly support the reasonableness of the estimated minimum rate included in the solicitation. The average production rate for the Milan Street and Exxon/Baton Rouge projects, the two projects comparable to the work described in the solicitation, exceeds the disputed estimate when computed on the basis of effective dredging time (1,790.93 + 1,300 /2 = 1,545.47 $ 1,013) or service hours (1,119.33 + 1,022 /2 = 1,070.67 $ 1,013). In addition, although the conditions at the Calumet

---

**7.** Mr. Russo states in his affidavits that, in determining the minimum production rate for the WID, he relied on the production rates from the Milan Street and Exxon/Baton Rouge projects computed in terms of service hours, which include both effective and non-effective dredging time. It is not at all clear why. As stated above, the solicitation defines the *actual* production rate as "the actual quantity of dredged material divided by the actual amount of *effective dredging time.*" § 01100 ¶ j(1) (emphasis added). Mr. Russo also states in his April 12, 1997 affidavit that "[n]one of [the] non-effective work is considered in determining the dredge's actual production rate." AAR Tab 16 ¶ 4. Yet he does not explain why he considered non-effective work in estimating the minimum rate. While this dis-

crepancy does not help plaintiff's case—counsel for defendant correctly notes that the production rates based on service hours "provide[ ] a more conservative figure" than the rates based on effective dredging times, Def. Mot. at 5 n. 5—it does raise the issue of whether Mr. Russo *underestimated* the WID's minimum production rate. If so, the public may be adversely affected by the proposed contract since, in the computation of adjusted effective dredging time, a low minimum rate may increase the ratio of the actual rate to the minimum rate, which would increase the amount paid to the contractor.

**8.** *See supra* n. 7.

Floodgates project area are more suitable for the WID than conditions in the dredging area described in the solicitation, the production rates for the Calumet Floodgates project (1430 cy/hr and 1,080 cy/hr) also exceed the Corps' estimated minimum rate and thus support its reasonableness. If anything, the results of these projects suggest that the Corps' estimate is too low, not too high, as plaintiff intimates.

Nonetheless, plaintiff argues that material issues of fact preclude the granting of defendant's motion. First, plaintiff contends that the solicitation includes the same estimated effective dredging times and minimum production rates for the WID and the 24″ cutterhead even though data from the Milan Street project suggests that the WID will take 30% longer to complete the work. According to Hooks, this fact "contradicts the solicitation's statement that there would be fair competition between dredges of dissimilar sizes and production rates." Pl. Opp'n at 3.

The Corps did, in fact, project that the WID would take 30% longer than the 24″ cutterhead to complete the work specified in the solicitation based on data from the Milan Street project. As stated above, the Corps determined that the WID would have had to rehandle 40% of the materials dredged during the Milan Street project in order to move all of the materials below the –50 ft NGVD. Since the WID spent 7.5 hours initially dredging all of the materials, the Corps concluded that rehandling 40% would take three hours (7.5 × 0.40 = 3.0). Since the WID spent 4.5 hours performing other non-effective dredging work, the Corps estimated that the total non-effective dredging time required by the WID would be 7.5 hours, or 50% of the total project completion time. *See* AAR Tab 16 ¶ 15.

In comparison, the Corps looked at the results of Hooks' performance of the 1996

contract for maintenance dredging in New Orleans Harbor. Hooks' 24″ cutterhead completed the work in 669.24 hours, 537.50 hours of effective dredging (80.31%) and 131.74 hours of non-effective dredging (19.69%).

Since the Corps determined that the WID and the 24″ cutterhead would have the same production rates in the area described in the solicitation, the Corps concluded that both dredges would require the same amount of effective dredging time. The Corps then compared the proportion of non-effective dredging time the WID required on Milan Street (50%) to the proportion Hooks' 24″ cutterhead required on the 1996 New Orleans Harbor contract (19.69%) and determined that the WID would take 30% longer to complete the proposed contract. Two-thirds of this additional time consists of rehandling and the remaining third consists of other, unspecified non-effective dredging time. *See* AAR Tab 16 ¶ 16.

As stated above, non-effective dredging time is not used as an evaluation criterion in the solicitation. The competition is controlled by the estimated *effective* dredging times set forth in item 0003 of the bid lots. Hence, the fact that the WID may require 30% more non-effective dredging time than the 24″ cutterhead to complete the proposed contract has no bearing on the fairness of the competition.[9] Accordingly, plaintiff's contention, even if true, does not create a genuine issue of material fact.

Hooks also asserts that the Corps' projection that the WID would have to rehandle 40% of the materials dredged during the Milan Street project is "pure speculation" and significantly understates the amount of rehandling the WID would have had to perform. PSOF ¶ 13. As discussed at length above, however, rehandling constitutes 0% pay time. It is not considered in the compu-

**9.** However, while two-thirds of the additional 30% non-effective dredging time required by the WID consists of rehandling, which is 0% pay time, the remaining third consists of unspecified non-effective dredging time, which may be 0%, 35% or 70% pay time. If the WID requires 10% more *payable* non-effective dredging time than the 24″ cutterhead, then the solicitation, by not using payable non-effective dredging time as an evaluation criterion, could conceivably provide a

competitive advantage to the WID. However, Hooks has presented no evidence suggesting that the additional 10% non-effective dredging time the WID may need is, in fact, payable time. The mere possibility is not sufficient to create a genuine issue of fact regarding the competitive fairness of the solicitation, especially in light of the heavy burden plaintiff faces in proving its case under the arbitrary and capricious standard.

tation of the WID's actual or estimated production rate or effective dredging time. While extensive rehandling may prolong the WID's non-effective dredging time and overall project completion time, these factors are not taken into consideration in the evaluation of bids. Hence, the validity of the Corps' 40% rehandling estimate for the WID also has no bearing on the competitive fairness of the solicitation.

Next, Hooks asserts that the reasonableness of the Corps' reliance on the Milan Street data is in dispute because that project did not require the WID to dredge a specific template whereas the 1996 New Orleans Harbor contract used to determine the production rate for the 24" cutterhead did impose such a requirement on Hooks. Hooks alleges that "it is inherently unfair and arbitrary to compare the two projects since a WID may have to use two passes to dredge to the specified template." PSOF ¶ 11. According to Mr. Robichaux, "[i]f the WID cannot dredge to the specified template in *one* pass as a cutterhead dredge can, a second pass in the 'specified cut' will reduce the effective dredging rate in half." SAAR Tab 4 Ex. 1 ¶ 2 (emphasis in original).

As stated above, the actual production rate for the WID is defined in the solicitation as "the quantity of cubic yards moved *out of the template* divided by the time period required to move the same quantity *from the template.*" § 01100 ¶ 8(b)(2) (emphasis added). Thus, the estimated production rate for the WID may have been more precise if the Corps had relied *exclusively* on projects which required the WID to dredge templates.[10] This also would insure that the actual and estimated rates are measuring the exact same activity and that the ratio of the actual to the minimum rate used to compute adjusted effective dredging time is internally consistent. However, plaintiff has not shown that it is *unreasonable* or *arbitrary* to use

the WID's demonstrated ability to move shoal materials *out of a general area* as a basis for estimating its ability to move shoal materials *out of a specific area.* Plaintiff's claim that the WID "may" have to make two passes to dredge a template is not supported. Furthermore, even if it is assumed that the WID would have to make two passes for every pass made by the 24" cutterhead, it would not follow that the WID's production rate would be half the 24" cutterhead's; the two dredges would still dredge at the same rate so long as the WID completed two passes in the time it took the 24" cutterhead to make one pass. Hence, defendant's speculative argument, not supported by any evidence in the record, does not create a genuine issue of material fact.[11]

Finally, all of plaintiff's allegations pertain to the Milan Street project. The data from the Exxon/Baton Rouge project alone establishes the reasonableness of the production rate and effective dredging time estimates for the WID since the project area is comparable to the dredging area described in the solicitation and, as stated above, the WID's production rate for the project, regardless of how it is computed, exceeds the disputed minimum rate. Hence, even if all of plaintiff's allegations were well founded, they would not create a genuine issue of material fact requiring the denial of defendant's motion. Plaintiff's failure to attack the validity of the data from the Exxon/Baton Rouge project (and, to a lesser extent, the data from the Calumet Floodgates project), despite ample opportunity to do so, is fatal to its case.

## CONCLUSION

Defendant has met its burden of demonstrating the absence of genuine issues of fact regarding the reasonableness of the minimum production rate and effective dredging time estimates for the WID included in the solicitation. Hence, although evidentiary

10. As stated above, the Exxon/Baton Rouge project apparently did require the WID to dredge a specific template and the production rates from that project support the reasonableness of the disputed estimate regardless of the appropriateness of the data from the Milan Street project.

11. Plaintiff's allegation that the WID left a "bust," *i.e.,* a hump of undredged material, at survey station 23600 of the Milan Street project, PSOF ¶ 8d, is also immaterial because it does not controvert the fact that the WID attained a production rate of 1,790.93 cy per dredging hour and 1,119.33 cy per service hour during the Milan Street project.

proceedings may be permitted in solicitation protests, no valid basis for this approach has been established in this case. Accordingly, defendant's Motion for Judgment on the Basis of the Administrative Record is **GRANTED**. The clerk is hereby **ORDERED** to enter final judgment in defendant's favor and dismiss the complaint. Each party must bear its own costs.