**DELBERT WHEELER
CONSTRUCTION,
INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 97–586 C.

United States Court of Federal Claims.

Oct. 3, 1997.

Reissued for Publication Oct. 16, 1997.[1]

---

**1.** This order was originally filed under seal on October 3, 1997 in accordance with the court's September 9, 1996 protective order in this matter. Pursuant to an October 3, 1997 order, the court allowed the parties to advise as to the portions of this order that should be redacted for publication. Redactions suggested by the parties have been incorporated into the order, and the redacted order is issued for publication this date, October 16, 1997.

John J. Fausti, Washington, DC, for plaintiff. Christopher L. Reive, Portland, OR, of counsel.

Sean H. Lane, Washington, DC, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director Anthony H. Anikeeff, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge.

In this post-award bid protest action, defendant filed a motion for judgment on the record and opposition to plaintiff's motion for a preliminary injunction. Plaintiff's application for a temporary restraining order is also before the court. As a result of the court's granting of defendant's motion for judgment on the record, plaintiff's preliminary injunction motion and application for a temporary restraining order are denied.[2]

2. Following oral argument, the court informed the parties of its findings and conclusions and ruled from the bench on October 1, 1997. This memorializes that order.

## BACKGROUND

### The RFP

On April 11, 1997, the Department of the Army, Portland District, Corp of Engineers ("the Corps"), issued request for proposals No. DACW57–97–R–0011 ("RFP") for the construction of five Columbia River Treaty in-lieu fishing access sites along the Columbia River, and renovation work at two existing sites. The fishing access sites are intended for use by the Yakama, Umatilla, Warm Springs, and Nez Perce tribes. The new sites will be located in Lyle, Washington and Stanley Rock, Oregon, and there is an option to develop an additional site at Bingen, Washington. The restoration of the fishing access sites is to occur at Wind River and Coos along the Columbia River in Washington state. The work to be performed includes paving access roads, and constructing various items including sanitary facilities, dock facilities, one boat ramp, fish cleaning stations, net repair areas, fish drying sheds, site utilities, camp area units, fencing, and planting and irrigation. The RFP states:

> [i]t is the goal of the Corps of Engineers to maximize participation of Native Americans in the construction of the in-lieu fishing site facilities under this acquisition. Consequently, evaluation criteria have been established in part on the basis of 10[sic] U.S.C. 450(e) of the Indians Self–Determination and Assistance Act (P.L. 93–638) to enhance the training and subcontracting opportunities for Native Americans.[3]

(A.R. at 61).[4] The RFP states that the contract will be awarded, through competitive negotiation, to the responsible offeror(s) whose offer conforms to the solicitation and is most advantageous to the government, considering three technical factors and price, with technical quality considered more important than price. *Id.* The RFP also states that as proposals become more equal in their technical merit, the evaluated cost or price becomes increasingly important. *Id.* Instructions accompanying the RFP identify three general technical evaluation factors (listed in descending order of importance), a price/cost criteria, and a succinct explanation of each factor and subfactor. *Id.* These criteria are briefly summarized here.

Criteria I, "Training and Employment of Native Americans," focuses on the offeror's proposal for the use of hiring halls, utilization of training programs, and other means of achieving maximum Native American employment. (A.R. at 62–63). In addition, each proposal is to be evaluated based upon its proposed management plan for coordination with the beneficiary tribes, including identifying procedures and/or a liaison to work with the tribal governments, locals, and residents. (A.R. at 63). Also to be considered was verification of the Native American status of subcontractors to be utilized by the offeror in completing the project, and whether the offeror had in place agreements with the tribes for employment and/or subcontracting. *Id.*

Criteria II is entitled "Participation of Small Businesses, Small Native American Businesses, and other Small Disadvantaged Businesses," and it instructs that the proposal identify and commit to the utilization of: (1) small businesses to complete at least 40% of the value of the contract; (2) small disadvantaged businesses (including small Native American businesses) to accomplish at least 30% of the total value of the contract: and (3) small Native American businesses to complete at least 25% of the total value of the contract. (A.R. at 63–64).

Criteria III requires a "Construction/Management Plan," and focuses on whether the proposal provides a work management plan, demonstrates past experience of the prime contractors and subcontractors, and indicates some experience working with Northwest Native American tribes and exposure to cultural resource issues. (A.R. at 64–65).

Criteria IV is "Price/Cost." The RFP provides in its "General Instructions" that:

---

**3.** The RFP cited incorrectly the United States Code title of the Indians Self–Determination and Assistance Act, which should have been title 25, instead of title 10. The section cited can be located at 25 U.S.C. § 450e (1994).

**4.** The court will refer to the administrative record as "A.R."

[t]he price and cost proposal will be reviewed for completeness and compatibility with the technical proposal and to determine the reasonableness of each offeror's technical proposal relating to the scope of work. Even though the total contract price will be evaluated, the primary emphasis *WILL NOT* be placed only on the lowest offered price. Price will not be scored. However, the final offered price will be utilized in the determination of the award, provided that it is fair and reasonable and the proposal is in the Government's best interest.

(A.R. at 61–62) (emphasis in original). The RFP provides guidance to offerors of the methodology for calculating price, along with a stated estimated cost/magnitude range of the project (in accordance with Federal Acquisition Regulation ("F.A.R.") § 36.204) of $1–$5 million (revised in Amendment # 1 to the RFP on April 11, 1997 (A.R. at 733) from a prior stated range of $5–$10 million). (A.R. at 51); *see* 48 C.F.R. § 36.204 (1996). Cost is to be calculated under the RFP by estimating the cost of completed construction items by site, as indicated by the itemized cost schedule provided in the solicitation. (A.R.53–57). The RFP also states that:

in the event any work is required by the Solicitation sections or the drawings and not specifically mentioned in the measurement payment paragraphs, separate or direct payment will not be made and all costs thereof are incidental to and included in the contract prices and payments for all items listed in the bid schedule.

(A.R. at 251). In addition, in a section entitled "Measurement and Payment," the RFP provides that "the contract price and payment will constitute full compensation for all work incidental to the completion of the item, unless such work is otherwise specifically mentioned for separate payment under another bid item." *Id.*

On May 28, 1997, the government's confidential estimate for the project of $ 3,426,493 was prepared and approved according to F.A.R. § 36.203. *See* 48 C.F.R. § 36.203 (1996). The cost estimate is used to compare the offeror's cost estimate to the government's estimate in determining which proposal provides the best value to the government.

**The Corps' Evaluation of the Proposals**

The proposals were to be submitted in two volumes. Volume I was to include the technical proposal, with no dollar costs/prices included. Volume II was to include the price proposal, including the itemized price schedule.

Seven offerors submitted proposals. The technical offers (i.e., Volume I of each proposal) were analyzed by a six member Technical Evaluation Team ("TET"), with each member, on the record, reviewing and scoring each offer. The proposals were analyzed under the first three (i.e., the technical) criteria. The evaluation team could award up to [ * * * ] points for Criteria I, [ * * * ] points for Criteria II, and [ * * * ] points for Criteria III.[5] Following independent evaluation, the team met to discuss the offers and to reach a consensus. On June 3, 1997, the team prepared a memorandum for the contracting officer containing the consensus scores and supporting rationales for each criteria and score. (A.R. at 2053–2060). According to the memo, White Eagle/Ohno Construction ("White Eagle/Ohno"), the successful offeror, received the highest technical score (217/[ * * * ]), plaintiff Delbert Wheeler Construction, Inc. ("Wheeler") received the second highest technical score (213/ [ * * * ]), and TKTM-s j.v. ("TKTM") received the third highest technical score (207/ [ * * * ]).[6] *Id.*

According to another memorandum, prepared on June 18, 1997 by the Corps' Contract Specialist and Contracting Officer, reporting on the TET's scoring on Criteria I, White Eagle/Ohno received a higher technical score (ten points higher) than Wheeler, and a lower technical score than TKTM. (A.R. at 2047–50). On Criteria II and III,

---

**5.** Upon request of the parties, protected information within this sentence has been replaced by asterisks within brackets in the published version of the order.

**6.** Upon request of the parties, protected information within this sentence has been replaced by asterisks within brackets in the published version of the order.

White Eagle/Ohno received lower technical scores (three points lower on each) than Wheeler. *Id.* White Eagle/Ohno received a higher score (by 25 points) on Criteria II, and a lower score (by 12 points) on Criteria III, than TKTM. *Id.*

Subsequent to the technical evaluation, the Corps separately analyzed the proposals to determine which constituted the "best value" for the United States. *Id.* White Eagle/Ohno was recommended in light of its superior technical score and its third-lowest bid price of $3,638,675. *Id.* Wheeler's cost proposal was the second highest, 30% higher than White Eagle/Ohno's cost proposal and 38% higher than the confidential government cost estimate. *Id.* In the June 18, 1997 memo, the population of offerors were listed in order of technical merit (scores were listed according to the three criteria and added up for the following total score), along with their prices:

| | Total Technical Score (Out of [* * *])[7] | Total Price |
|---|---|---|
| White/Eagle Ohno | 217 | $3,638,675.00 |
| Wheeler | 213 | $4,759,700.00 |
| TKTM | 207 | $3,379,300.00 |
| Coville Tribal Serv. Corp. | 194 | $4,976,391.00 |
| Tomco Construction | 163 | $3,525,582.00 |
| W.F. Plummer/Huylar | 137 | $4,733,601.00 |
| Lloyd Kessler, Inc. | 122 | $4,372,998.60 |

(A.R. at 2048–49).

On June 24, 1997, the Corps awarded the contract to White Eagle/Ohno Construction. Plaintiff and the other offerors were informed by letter that they were not selected and were offered a post-award debriefing. Plaintiff requested such a debriefing.

At the debriefing, the Corps indicated that plaintiff's technical score in Criteria I (Training and Employment of Native Americans) was reduced because plaintiff's proposal did not set adequate hiring goals, did not provide a specific training program plan, did not name a liaison person for the tribes in its Tribal Employment Rights Office, and did not provide verification of the Native American status of the identified subcontractors. Plaintiff was also informed that its price was higher than that of the successful offeror and the government's cost estimate. Wheeler expressed skepticism over White Eagle/Ohno's price and the government estimate, stating that it knew that funds for training and employment could not have been included in them because Wheeler had estimated those costs at $300,000.[8] At the end of the debriefing, Wheeler presented the Corps with a written protest.

**Plaintiff's Post–Award Bid Protest**

On August 12, 1997, Wheeler's protest was denied by Division Counsel for the Corps. Plaintiff filed an application for a temporary restraining order and a motion for a preliminary injunction in this court on August 27, 1997 to enjoin defendant from proceeding with performance of the contract.[9] Plaintiff also filed a complaint, alleging that various actions of the government during the procurement process were unreasonable, not in

---

**7.** Upon request of the parties, protected information has been replaced by asterisks within brackets in the published version of the order.

**8.** Plaintiff later provided an affidavit of Wheeler's General Manager, Dan Berg, who stated that he actually estimated the cost of training and employment in Wheeler's proposal to be $605,224. (Affid. of Dan Berg at 3).

**9.** An earlier bid protest was filed on July 14, 1997, by TKTM, another unsuccessful offeror in the contract award, with the General Accounting Office (GAO). The TKTM protest triggered an automatic stay preventing the Corps from issuing a notice to proceed to the successful offeror. The TKTM protest was stayed in light of this proceeding. In a September 2, 1997 joint status report, defendant informed the court that the Corps had agreed to voluntarily honor the stay until October 3, 1997. The Corps allegedly must issue the notice to proceed by October 3, 1997 in order for the contractor to complete the work within an environmentally limited construction season (December through February).

accordance with law, and arbitrary and capricious.

On September 19, 1997, defendant filed (under seal per the court's September 9, 1997 protective order) a motion for judgment on the record and opposition to plaintiff's motion for a preliminary injunction.[10] Defendant argues that plaintiff lacks standing to challenge the award of the contract to White Eagle/Ohno, and that defendant's evaluation and award of the Contract were not arbitrary and capricious. For the reasons set forth below, the court finds that plaintiff has standing to protest the award, but that the evaluation of the proposals and award of the contract to White Eagle/Ohno were not arbitrary and capricious. Therefore, the court grants defendant's motion for judgment on the record and, in doing so, denies plaintiff's motion for a preliminary injunction.

## DISCUSSION

### I. Defendant's Motion for Judgment on the Record

Before addressing, the merits of defendant's motion for Judgment on the record, the court will address defendant's argument that plaintiff lacks standing in this court to challenge the award of the contract to White Eagle/Ohno.

### A. Standing

Defendant alleges that plaintiff does not have standing because it is not an "interested party" able to protest the award. Defendant alleges that plaintiff cannot have standing because it could not have qualified for award of the contract in light of the mandate of 33 U.S.C. § 624, which states that the Army Corps of Engineers shall not award a contract if the proposed contract price is more than 125 percent of the government's estimated ("fair and reasonable") cost ("the 125% rule"). 33 U.S.C. § 624 (1994); *see also* E.F.A.R.S. § 36.203–100, 36.205 (the

Corps of Engineers' regulations implementing 33 U.S.C. § 624). Plaintiff's cost estimate for the project was $4,759,000, or 38% higher than the confidential government cost estimate. For the reasons set forth below, the court disagrees with defendant's application of 33 U.S.C. § 624 as preventing plaintiff from challenging the solicitation and award, and therefore finds that plaintiff has standing to pursue its claim in this court.

### 1. "Interested Parties" in Post–Award Bid Protests—The Tucker Act Amendments

The Administrative Dispute Resolution Act of 1996, Pub.L. No.104–320, 12(a)-(1,), 110 Stat. 3870, 3874 (1996), amended the Tucker Act, 28 U.S.C. § 1491(1994), and provided the Court of Federal Claims with federal procurement, post-award bid protest jurisdiction, concurrent with that of federal district courts, for actions filed on or after December 31, 1996. *See* 28 U.S.C.A. § 1491(b)(1)-(4) (West.Supp.1997). The Tucker Act now states:

> [t]he United States Court of Federal Claims.. shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement ... the United States Court of Federal Claims ... shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C.A. § 1491(b)(1) (West Supp.1997). To have standing to bring a bid-protest action, therefore, a party must be an "interested party." *Id.*

---

**10.** Defendant also filed on September 19, 1997 its opposition to plaintiff's September 15, 1997 motion to conduct discovery on an expedited basis. The court held a status conference with the parties on September 23, 1997 to determine what, if any, discovery should be allowed to supplement the administrative record provided

by defendant. Pursuant to its September 24, 1997 order, the court allowed discovery on the government's cost range and estimate, and plaintiff's allegation of inside information allegedly provided to White Eagle/Ohno during the solicitation.

### a. Definition of "Interested Party"

■ Neither the original version of 28 U.S.C. § 1491, nor the amendments, define the term "interested party." In determining whether a bid protester is an "interested party," the court has, in the past, utilized the definition of "interested party" in the statute granting bid protest authority to disappointed contractors ·at the GAO. *See* 31 U.S.C. § 3551(2) (1994). The GAO authority defines an "interested party" as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of a contract or by a failure to award the contract." *Id.* The Federal Circuit has interpreted "interested party" to mean that a protest may be initiated "only by an actual or prospective bidder who would have been in a position to receive the challenged award." *Federal Data Corp. v. United States*, 911 F.2d 699, 703 (Fed.Cir.1990).[11]

### b. Plaintiff is an "Interested Party"

Defendant's assertion that plaintiff is barred from challenging the evaluation and award of the contract because of the 125% rule blurs the line between being in a *position* to receive the award during the evaluation, which is the threshold to establishing "interested party" status, and actually being awarded the contract. An offeror whose estimated contract price bars him, according to statute, from being *awarded* the contract *at the time the contract is awarded*, can actually have been in a position to receive the contract until the actual award is made.

■ Defendant's conduct during the solicitation and evaluation indicates that even defendant considered plaintiff to be a true competitor for the award, as plaintiff's technical and price evaluation was conducted in the same manner as the six other offerors. Especially in light of the emphasis placed on the offerors' technical proposal, for which plaintiff scored second, defendant acted as though plaintiff were a true contender. In addition, the cost estimate that defendant alleges is the established estimate that plaintiff, by statute, cannot exceed by 25 %, was actually arrived at (confidentially) on May 28, 1997, *after* plaintiff's proposal, along with its cost estimate, was submitted to defendant on May 23, 1997.

During a competitive negotiation, several changes can occur that may affect whether an offeror is able, technically and in cost terms, to be awarded the contract. For example, the government is entitled, pursuant to the F.A.R. § 15.606, to change its requirements, including the RFP evaluation factors, either before or after the receipt of the proposals. 48 C.F.R. § 15.606 (1996). In addition, the government is entitled to update its cost estimate, if necessary, for use in the price analysis. While neither of these mechanisms were utilized by the government in this solicitation, the fact that the government was able to make such changes in the solicitation and cost estimate supports the fact that plaintiff could have been awarded the contract up until the moment that the actual contract was awarded.

---

**11.** In addition, the APA, from which the Tucker Act adopts the standard of review of agency action for pre- and post-award bid protests, states that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702 (1994 & Supp. II 1996). This requirement has been interpreted as mandating that a complainant establish: (1) that it has suffered or will suffer injury in fact from the agency action; and (2) that its interests lie within the zone of interest protected or regulated by a statute. *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 395–96, 107 S.Ct. 750, 754–55, 93 L.Ed.2d 757 (1987). In the government contracts, bid-protest, context, this standard has been interpreted as providing standing to a disappointed bidder to act as a "private attorney general" "in order to prevent [ ] the granting of

[a] contract through arbitrary or capricious action" amounting to "illegal [agency] activity." *CC Distributors, Inc. v. United States*, 38 Fed.Cl. 771, 775–77 (1997) (quoting *National Fed'n of Fed. Employees v. Cheney*, 883 F.2d 1038, 1052–53 (D.C.Cir.1989); *Scanwell Laboratories Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C.Cir.1970)). Not every bidder in a solicitation may assert disappointed bidder status; standing is only conferred to those bidders "within the zone of active consideration for the bid's award." *CC Distributors*, 38 Fed.Cl. at 777 (citations omitted).

As stated above, the Tucker Act Amendments fail to provide a definition of an "interested party," and thus do not delineate whether to use the GAO or APA standing definition. Although the court provides its analysis under the narrower GAO standard, the result of this court's granting plaintiff standing would not change under the APA standard.

To find that plaintiff became barred from challenging the contract award on May 28, 1997, when the government's cost estimate was approved, would be unfair in light of defendant's conduct and the ability of the government to subsequently change that estimate. It would be illogical for the court to find that under the Tucker Act amendments, a protester's standing can be established during the evaluation, only to disappear and then reappear because of factors out of its control. During the evaluation, the party is either an actual offeror, within the zone of consideration for the contract, or it is not. Here, it is clear that defendant considered plaintiff to be a true contender for the contract.

Therefore, the court disagrees with defendant that plaintiff was not an "actual bidder" (i.e., was not in a position to receive the award) because of the 125% rule. Irrespective of whether plaintiff could have legally been awarded the contract *when the award was made,* plaintiff was an "actual bidder" who, during the evaluation process, was *in a position to win the contract.* As a result, the court finds that plaintiff is an "interested party" under the Tucker Act, and therefore plaintiff has standing to challenge the evaluation and award of the contract to White Eagle/Ohno.

### B. Judgment on the Record

■ Motions for judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1: *Rose v. United States,* 35 Fed.Cl. 510, 512 (1996). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A fact is considered material if it might significantly affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In deciding a motion for judgment upon the record, as with summary judgment, the role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511.

A party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the moving party demonstrates an absence of genuine issues of material fact, the burden then shifts to the non-moving party to show that a genuine factual dispute exists. *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1563 (Fed.Cir. 1987). Alternatively, if the moving party shows an absence of evidence to support the non-moving party's case, the burden shifts to the non-moving party to proffer such evidence. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553–54. Neither party may discharge its burden by cryptic, conclusory, or generalized responses. *Willetts v. Ford Motor Co.,* 583 F.2d 852, 856 (6th Cir.1978). The court must resolve any doubts over factual issues in favor of the party opposing summary judgment. *Litton Indus. Prods., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir. 1985). The non-movant is entitled to the benefit of all presumptions and inferences. *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984).

### 1. The Standard of Review

The 1996 amendments to the Tucker Act direct the courts to apply the standard of review set forth by the APA—" courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C.A. § 1491(b) (West.Supp.1997). Therefore, a bid protest must be rejected unless the court finds that the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a) (1994 & Supp. II 1996).

■ The scope of this court's inquiry into the propriety of agency action in bid protest cases is similarly limited. The primary focus of the court's review is the information that was before the agency when it made its final decision. *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 345, 349 (1997). This court, however, has recognized that the ad-

ministrative record is solely within agency control, and therefore has "adopted a flexible approach both in putting together the evidence that will be considered and in discovery, balancing the limited nature of the court's review with the competing need to recognize potential exceptions to treating the agency's submission as tile four corners of the inquiry." *Cubic,* 37 Fed.Cl. at 349.

Here, the court allowed adequate discovery to enable plaintiff to compile information related to matters that would fall beyond the administrative record, and to prepare for oral argument. Specifically, plaintiff was permitted to explore alleged irregularities in the preparation of the government's cost estimate and cost/magnitude range; incorporation of training and employment in the government's cost estimate; and allegations that the awardee had improper access to inside information. The fruits of plaintiff's discovery were filed with the court and referenced in oral argument. Where relevant they were considered by the court.

 The arbitrary and capricious standard is highly deferential. The reviewing court does not substitute its judgment for that of the agency, rather the court reviews the facts to determine whether the agency's decision was legally permissible, reasoned, and factually supported. *See, e.g., Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). As long as a rational basis is articulated and relevant factors are considered, the agency's action must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974).

 Contracting officials may properly exercise wide discretion in their evaluation of bids and the application of procurement regulations. *Electro–Methods, Inc. v. United States,* 7 Cl.Ct. 755, 762 (1985). Moreover, "[t]here is ... a strong presumption that government officials act correctly, honestly, and in good faith when considering bids." *Cincom Sys. Inc. v. United States,* 37 Fed.Cl. 663, 669 (1997). This discretion is especially broad where, as here, the contract was awarded through negotiated procurement. *CACI Field Servs., Inc. v. United States,* 13

Cl.Ct. 718, 726 (1987), aff'd, 854 F.2d 464 (Fed.Cir.1988); *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 685 (1985). Broad discretion is justified because negotiated procurement is "inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of. the judgment called for. . . ." *Sperry Flight Sys. Div. v. United States,* 212 Ct.Cl. 329, 548 F.2d 915, 921 (1977). "Effective contracting demands broad discretion." *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 958–59 (Fed.Cir.1993).

 It is the burden of the aggrieved offeror to demonstrate that there is no rational basis for the agency's determination. *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). "Because the principle of action 'without any reasonable basis' is closely related to the bad faith test, [where no bad faith exits] it is highly unlikely the conduct of [defendant] can be said to have had 'no reasonable basis.' " *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 597 (1980).

The Court of Claims, in *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 574, 492 F.2d 1200 (1974), set forth four factors that are generally considered when determining whether the government contracting officials have acted arbitrarily or capriciously towards an offeror-claimant: (1) the existence of subjective bad faith on the part of the procuring officials, thus, depriving the offeror of fair and honest consideration of its proposal; (2) the absence of a reasonable basis for the administrative decision; (3) the degree of discretion given to the procurement officials by applicable statutes and regulations; and (4) the proven violation of pertinent statutes or regulations, which, if violated, may form the basis for recovery, but need not do so automatically.

## 2. Application of the Arbitrary and Capricious Standard

Defendant has moved for judgment on the record, alleging that the Corps' decision to award the contract to White Eagle/Ohno was reasonable, and not arbitrary and capricious. Defendant addressed each of plaintiff's alle-

gations by supporting (with the record) each step in defendant's evaluation process. Plaintiff's allegations of impropriety in the procurement process fall into three categories. The first category involves the alleged impropriety in defendant's evaluation of plaintiff's technical proposal. Second are plaintiff's allegations of arbitrary, capricious, and illegal conduct in defendant's calculation and modification of estimates of the project's cost. Third are plaintiffs allegations that the successful offeror improperly obtained inside information when preparing its proposal. The following discussion analyzes defendant's argument that the evaluation process was proper, and addresses each of plaintiff's concerns.

### a. Technical Evaluation of Plaintiff's Proposal

■ Plaintiff claims several deficiencies in defendant's evaluation of its technical proposal, and that defendant's technical evaluations were "hopelessly confused." The contracting officer, through the technical evaluation team, conducted an extensive evaluation of the technical proposals of all seven offerors. The evaluation was conducted according to the solicitation, which clearly explains and states the order of importance of each criteria. The six members of the TET individually, and then collectively, evaluated each proposal and clearly stated their collective findings with respect to each offeror's proposal in a memorandum to the contracting officer. Based solely on the three technical factors, the awardee received the highest overall technical score of the seven offerors.

Plaintiff claims that the Corps' evaluation of its proposal on Criteria I was severely flawed, and thus arbitrary and capricious. First, plaintiff alleges that it should not have received a lower technical score because it is a 100% Native American-owned company that employs a workforce of 90% Native Americans, as compared to the successful offeror, a joint-venture between a partially-owned Native American company and a minority-owned company that proposes to employ a 50% Native–American workforce during the project. Second, plaintiff alleges that defendant did not properly assess its proposal for training and employment of Native Americans under Criteria I, including, plaintiff alleges, agreements that it has in place with the tribes. Third, plaintiff alleges that defendant improperly scored White Eagle/Ohno under Criteria I because its contract administration (i.e., bonding, accounting or project management) would allegedly be performed by solely non-Native American participants of the joint venture.

Plaintiff scored fourth out of seven on Criteria I (although only 13 points lower than TKTM, who scored first), for several reasons that are explained adequately in the record. For example, although describing the benefits of plaintiff's proposal under Criteria I (including plaintiff's work with the beneficiary Tribes in the past), the TET was concerned with plaintiff's lack of a specific training program and its failure to identify a liaison in its proposal. Plaintiff's descriptions to the court of its training plans and the fact that the individual who would serve as the liaison was implicit, rather than explicit, in their proposal is irrelevant to this court's review of the contracting officer's evaluation of plaintiff's proposal. Plaintiff fails to provide the court with any reason to believe the evaluation of its proposal was arbitrary and capricious. Instead, plaintiff urges the court to consider why it should have been scored higher than the other offerors on Criteria I. Upon reviewing the entire record, however, the court finds that although the Corps may have been provided with several adequate proposals, it scored and chose the successful offeror for reasons that are sound and well-documented. Plaintiff's repeated allegations that its proposal was misunderstood or not properly assessed are wholly unfounded and unsubstantiated. The evaluation by the Corps was comprehensive, reasonable, and not arbitrary and capricious. Therefore, this court refuses to disturb the agency's decision to award the contract to the successful offeror.

Similarly, plaintiff's allegation that the Corp failed to properly consider, under Criteria III of the RFP, its experience as a subcontractor on Phase I of the Columbia River Treaty project, is unfounded. In fact, according to the record, the Corps gave

plaintiff a higher score than the successful offeror on Criteria III. On its face, the court fails to find any reason why the Corps' evaluation on Criteria III was in any way unreasonable.

Plaintiff claims that its proposal is technically superior to White Eagle/Ohno's proposal; however plaintiff has failed to demonstrate that the defendant's scoring of the proposals was arbitrary and capricious. The court cannot find, and plaintiff has failed to demonstrate, that defendant acted without any reasonable basis or in bad faith in scoring the proposals. Absent such a showing, the court does not have the discretion to disturb the decision of the contracting officer. In any event, plaintiff's argument that its bid is technically superior does not change the fact that plaintiff's bid was over $1 million higher than the successful offeror, and thus that the successful offer, on its face, provided the government with the best value.[12]

### b. Calculation and Modification of Cost Estimates for the Project

Defendant alleges that the government's confidential cost estimate and cost/magnitude range were prepared in a reasonable manner. Plaintiff alleges that the government's failure to include specific funds for RFP Criteria I, Training and Employment of Native Americans, within the government cost estimate was irrational, arbitrary, capricious, and/or contrary to law. Plaintiff further alleges that the government's conduct was arbitrary and capricious with respect to changes in the government's cost/magnitude range and estimates of the project cost, and the failure to conduct discussions with the offerors.

### i. Failure to Include Funds for Training and Employment of Native Americans in the Cost Estimate

 Plaintiff alleges that the failure to include estimated costs for Training and Employment of Native Americans, was not in accordance with law, inconsistent with the RFP, and contrary to defendant's evaluation criteria.[13] In response, the government states that, to the extent there were additional costs for training and employment, they were included within the "government estimate" as overhead costs.

The criteria listed in the RFP, including Criteria I, were designed to assess the merits of the proposals. Criteria I, Training and Employment of Native Americans, was an important policy objective, established in light of 25 U.S.C. § 450e. Accordingly, Criteria I was given greater weight than the other criteria—offerors could accumulate more points for addressing this objective than any other.

Notwithstanding plaintiff's circuitous arguments to the effect that the government's actions were defective because the RFP did not meet the social policy objectives of the United States under the Columbia River Treaty, the court finds that the government's cost estimate was clearly not arbitrary and capricious. It would have been reasonable for the contracting officer to allocate specific funds to training and employment, as plaintiff argues it should have. It was also reasonable for the contracting officer to factor training and employment into the "overhead costs" category. In actuality, the contracting officer could have excluded specific funds for training and employment from the estimate altogether, because none of the sources relied upon by plaintiff require the contracting officer to allocate specific funds to training and employment. Defendant clearly complied with 25 U.S.C. § 450e, by creating preferences for Native American contractors, subcontractors, and workers. Each offeror presented a plan for Training and Employment of Native Americans. Three offerors (including the successful offeror) achieved higher technical scores in Criteria I than plaintiff. Two of the three offerors (includ-

12. As stated below, plaintiff's statement that price should not have been a significant consideration in the selection of the successful offeror ignores the plain language of the RFP.

13. Plaintiff's allegation that specific funds should have been allocated to training and employment is inconsistent with the RFP, which lists Training and Employment of Native Americans as an evaluation criteria rather than a cost item. Nevertheless, plaintiff's claim is necessarily confined to alleged extraordinary training and employment costs, over and above those which would be incurred by non-Native American companies and crews. The parties concede that basic labor costs are included in the estimate.

ing the successful offeror) were able to do so at a price in line with the government's estimate. As a result, the court finds that the Corps' inclusion of training and employment costs in overhead, without including such costs, as direct costs, in any other aspect of the estimate, was reasonable, and not arbitrary or capricious.

As a result of the court's finding that the cost estimate was reasonable, and not arbitrary and capricious, defendant was actually forbidden by 33 U.S.C. § 624 from awarding the contract to plaintiff at the time the award was made because plaintiff's cost estimate for the project was greater than 25 percent of the government's cost estimate. 33 U.S.C. § 624. In fact, plaintiff's cost estimate was 38 percent higher than the government's cost estimate. As stated above, while the 125% rule articulated in 33 U.S.C. § 624 does not preclude plaintiff's having standing to protest the evaluation and award of the contract, it did forbid the Corps from awarding the contract to plaintiff as a result of our finding that the government estimate was fair and reasonable, and not arbitrary and capricious.

### ii. Changes in the Cost Estimate and Range

As early as February 1997, the government assigned an "estimated dollar amount" of $6,123,859 for the Columbia River Treaty Fishing Access Sites. (A.R. at 1). Pursuant to F.A.R. § 36.204, the government included a cost/magnitude range of between $5 million and $10 million in a pre-solicitation notice issued on February 21, 1997. *See* 48 C.F.R. § 36.204 (1996). (A.R. at 13). Estimates of $6 million and $6.1 million appear in memoranda prepared by the Corps in March, 1997, and April, 1997, respectively. (A.R. at 28, 29). The initial RFP, issued April 11, 1997, also included a cost/magnitude range, pursuant to the F.A.R. § 36.204(g), of $5 to $10 million. (A.R. at 51); *see* 48 C.F.R. § 36.204(g) (1996). After the initial RFP was issued, the Corps determined that the February, 1997 estimate overstated contingency costs and thus, amended the RFP on May 5, 1997 to recertify the magnitude of the construction project as between $1 and $5 million. (A.R. at 733).

As Engineering Regulation No. 11 10–2–1302 indicates, the government will, by necessity, have a variety of estimates for a project. Department of the Army, U.S. Corps of Engineers, ENGINEERING AND DESIGN, CIVIL WORKS COST ENGINEERING, Regulation No. 1110–2–1302 (March 1994). These estimates will differ according to the purpose for the estimate and the time at which it is made. In fact, during the solicitation, the government only had one official, confidential "cost estimate" prepared and approved in accordance with the F.A.R. § 36.203. *See* 48 C.F.R. § 36.203 (1996). The court finds that the use of multiple estimates in the course of this project was not arbitrary or capricious, or an abuse of the contracting officer's discretion.

### iii. Failure to Conduct Discussions

Finally, plaintiff alleges that the failure to conduct discussions with the offerors was arbitrary and capricious in light of the disparity in bid prices and plaintiff's Criteria I score. The contracting officer's decision to award the contract without discussions with the offerors was not an abuse of discretion. F.A.R. § 15.610 permits the contracting officer to ignore the discussion requirement where, as here, the solicitation notifies offerors that the government intends to award the contract without discussions. 48 C.F.R. § 15.610 (1996). The solicitation clearly stated that the government intended to evaluate proposals and award a contract without discussions with offerors. (A.R. at 75). Therefore, the government's actions in not conducting negotiations were entirely reasonable.

### C. Plaintiff's Inside Information Allegation

Plaintiff alleges that the successful offeror, White Eagle/Ohno, improperly received inside information in preparing its proposal. In light of plaintiff's total lack of substantiation of its allegation, defendant moves for judgment on the record. Plaintiff's claim of inside information is based upon the allegation that a former employee of the Corps was affiliated with the successful offeror and secured inside information and preferential treatment for the successful

offeror. Plaintiff suggests that the successful offeror used inside information to revise its estimate to within 6 percent of the government's estimate before its proposal was submitted. The only evidence plaintiff offered to support these allegations is a document within the successful offeror's proposal that purports to demonstrate a higher version of its cost estimate before its proposal was submitted. The documents plaintiff cites do not in any way reflect a change in the successful offeror's cost estimate. In addition, plaintiff offers no other support for these allegations.

This court cannot rely on suspicion and innuendo to conclude that impropriety tainted the procurement process. *CACI, Inc.— Federal v. United States,* 719 F.2d 1567, 1582 (Fed.Cir.1983). Plaintiff cannot raise a genuine issue of fact with unsupported, generalized statements allegedly supporting its suspected inside information claim. As a result, the court finds that plaintiff has failed to meet its burden. For the reasons stated above, defendant's motion for judgment on the record is granted.

## II. Plaintiff's Motion for a Preliminary Injunction

■ In determining whether to grant a preliminary injunction, the court applies a four-part test which has been discussed in numerous comprehensive opinions of this court. *See, e.g., Magellan Corp. v. United States,* 27 Fed.Cl. 446 (1993); *TRW Envtl. Safety Sys., Inc. v. United States,* 16 Cl.Ct. 520 (1989). Under this standard, plaintiff must demonstrate the following: (1) a likelihood of success on the merits; (2) irreparable injury to plaintiff if defendant is not enjoined, including but not limited to the absence of an adequate remedy at law; (3) the harm to plaintiff outweighs the harm to defendant; and (4) the public interest is served by enjoining defendant. *Magnavox Elec. Systems Co. v. U.S.,* 26 Cl.Ct. 1373, 1378 (1992) (citing *Zenith Radio Corp. v. United States,* 710 F.2d 806, 809 (Fed.Cir. 1983)). Plaintiff bears the burden of proving it is entitled to such relief by clear and convincing evidence. *Baird,* 1 Cl.Ct. at 664;

*Heli–Jet Corp. v. United States,* 2 Cl.Ct. 613 (1983).

For the reasons set forth above, plaintiff has met none of the elements of the test.

## CONCLUSION

As a result of the court's analysis above, the court finds that judgment upon the record is appropriate. Defendant's actions were not arbitrary, capricious, abusive of discretion, or otherwise not in accordance with law as to any respect of this procurement brought to the attention of this court. The court has considered all of plaintiff's concerns about the evaluation and award of the contract. After carefully reviewing the record and other materials submitted to the court, the court is unconvinced of the alleged improprieties in the evaluation. The contracting officer has a right to evaluate the proposals according to the stated criteria, and to award the contract to the offeror, who in his opinion, provided the best value (which includes superior technical merit) to the government. Absent proof that the evaluation was arbitrary and capricious, the court will not disturb the contracting officer's decision. Defendant has adequately demonstrated an absence of genuine issues of material fact and plaintiff has failed to come forward with any credible evidence to the contrary. Mere allegations based on supposition and happenstance are not enough to refute defendant's actions and create a need for further proceedings.

For the foregoing reasons, defendant's motion for judgment on the record pursuant to RCFC 56.1 is granted. Plaintiff's motion for a preliminary injunction and application for a temporary restraining order are denied. Because all issues have been disposed of there is nothing more before the court. The complaint is dismissed. The clerk shall enter appropriate judgment.

**IT IS SO ORDERED.**