**PIKES PEAK FAMILY HOUSING, LLC, Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**and**

**Keller/Catellus Fort Carson, LLC, Defendant–Intervenor.**

**No. 98–147C.**

United States Court of Federal Claims.

April 7, 1998.

674

Paul W. Killian, Washington, DC, attorney of record for plaintiff.

S. Lane Tucker, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant.

Stephen S. Kaye, Washington, DC, attorney of record for defendant-intervenor.

## OPINION

REGINALD W. GIBSON, Senior Judge.

### INTRODUCTION

Pikes Peak Family Housing, LLC (hereinafter "plaintiff") filed its complaint in this pre-award bid protest on March 3, 1998. Plaintiff contests the proposed award of a military housing contract by the United States Army Corps of Engineers (hereinafter "defendant" or "the Army"), pursuant to Solicitation No. DACA45–96–R–0033, issued December 30, 1996 (the "RFP"), to Keller/Catellus Fort Carson LLC (hereinafter "defendant-intervenor"). Said RFP invites private sector firms to submit proposals for the implementation of the Army's planned privatization of family housing facilities at Fort Carson, Colorado, under the authority of the Military Housing Privatization Initiative, Pub.L. 104–106, Title XXVIII, Subtitle A, § 2801, 110 Stat. 544 (1996), *codified at* 10 U.S.C. §§ 2871–2885. Of the 15 proposals received from offerors by the Army, defendant-intervenor's was the highest ranked and plaintiff's was the sixth highest ranked. Plaintiff contends that the Army improperly determined that the competitive range of offers received in this solicitation consisted solely of the offer submitted by defendant-intervenor.

The immediate controversy at bar centers upon the scope of discovery to which plaintiff is entitled in order to prepare this Administrative Procedure Act case. Defendant filed the administrative record for this solicitation on March 16, 1998, and supplemented said record with additional submissions on March 17–18, 1998. It is undisputed and conceded by both defendants that *counsel* for plaintiff is entitled to review the administrative record in its entirety. However, the Government and defendant-intervenor have each moved the court to enter a protective order which, among other things, would prohibit counsel for plaintiff from disclosing to plaintiff's officers and employees certain materials in the administrative record relating to the Army's evaluation of proposals of other offerors received in this solicitation. Orally and in writing, both defendants have strenuously and repeatedly argued that the disclosure of *any* proposal evaluation information to plaintiff's business personnel will irredeemably taint a resolicitation, should one prove necessary, by granting plaintiff a competitive advantage relative to other offerors' prospective proposals. Moreover, the Government and defendant-intervenor warmly urge that the court defer to the Army's judgment in procurement matters. On similar reasoning, the Government further asserts that judicial inquiry—and, by necessary implication, discovery—beyond the administrative record is categorically improper in bid protest actions.

By order dated March 23, 1998, after having duly considered the parties' respective arguments for and against discovery in this action, the court directed that plaintiff "shall be entitled to discovery, including the production of documents not already within the administrative record and the taking of depositions, relating to the evaluation of *its* proposal, and none other, by defendant's Source Selection Authority (SSA), Source Selection Advisory Council (SSAC), Source Selection Evaluation Board (SSEB), and Performance Risk Assessment Group (PRAG)."[1] Order filed March 23, 1998 at 1, ¶ 1, attached hereto as Appendix A (emphasis in original). So as to maintain plaintiff and defendant-intervenor on equal footing in this litigation, the court also ordered that defendant-intervenor is likewise entitled to conduct discovery pertinent to the evaluation of its proposal, and none other, by the Army. *Id.* at 1, ¶ 2.

Thereafter, in a telephonic status conference held on March 24, 1998, defendant and defendant-intervenor objected to the scope of discovery permitted by the Order of March 23, 1998, again citing the purported competitive advantage plaintiff would possess in the event of a resolicitation. Defendant even goes so far as to assert that the Army would likely cancel the solicitation and resolicit for the Fort Carson military housing project if discovery were allowed to proceed in this fashion. In the interests of fairness and

---

1. The named entities are the person(s), or groups of persons, charged with reviewing, evaluating, and ranking the proposals received by the Army in this solicitation, in accordance with the Army's written Source Selection Plan.

justice, by orders dated March 24 and March 30, 1998, the court directed the parties to file written statements of their respective positions concerning the permissible scope of discovery and further, decreed that discovery be stayed, pending the court's deliberations, until further notice.[2]

Against this background, today the court decides the following two narrow, non-dispositive, questions of pretrial procedure:

(i) Whether plaintiff is entitled to conduct limited discovery beyond the four corners of the administrative record for purposes of supplementing said record; and

(ii) Whether counsel for plaintiff can disclose to its client certain information, whether already in the administrative record or obtained through discovery, pertinent to the Army's evaluation of plaintiff's own proposal.

After a thorough consideration of the relevant legal authorities and the submissions of the parties, we are constrained to answer both questions in the affirmative. In so holding, we decline to certify either question for interlocutory appeal pursuant to § 28 U.S.C. 1292(d)(2), as requested by defendants.

## DISCUSSION

### A. Scope of Permissible Discovery

■■■ Well reasoned, recent decisions of the Court of Federal Claims uniformly conclude that, upon a finding that the administrative record in a bid protest case is incomplete or inadequate, it lies within the court's discretion to order that said record be appropriately supplemented. See Cubic Applications, Inc. v. United States, 37 Fed.Cl. 339, 342 (1997) (Cubic I); Cubic Applications, Inc. v. United States, 37 Fed.Cl. 345, 350 (1997) (Cubic II); Mike Hooks, Inc. v. United States, 39 Fed.Cl. 147, 154–56 (1997);

GraphicData, LLC v. United States, 37 Fed. Cl. 771, 779–80 (1997); Aero Corp., S.A. v. United States, 38 Fed.Cl. 408, 411 (1997); Day & Zimmermann Services v. United States, 38 Fed.Cl. 591, 597 n. 6 (1997); id. at 599–607 (administrative record extensively supplemented with testimony at trial on the merits); Delbert Wheeler Constr., Inc. v. United States, 39 Fed.Cl. 239, 246–47 (1997). To be sure, in the exercise of this court's jurisdiction over bid protests, pursuant to the Tucker Act, 28 U.S.C. § 1491(b), it is generally true that at first blush the "focal point for judicial review 'should be the administrative record already in existence, not some new record made initially by the reviewing court.'" Cubic I, 37 Fed.Cl. at 342 (quoting Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); citing Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1606–07, 84 L.Ed.2d 643 (1985)). This threshold constraint on judicial review is rooted in 28 U.S.C. § 1491(b)(4), enacted in 1996, which adopts the somewhat deferential standard of review prescribed by the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.[3]

There is, however, a critical difference between the contemporaneous record compiled by an agency in the course of a formal adjudication or rulemaking proceedings under the APA, and the administrative record hospitably assembled by the agency for purposes of bid protest litigation, which is merely "a post facto recreation of a procurement's documentary trail." Alfa Laval Separation, Inc. v. United States, 40 Fed.Cl. 215, 220 n. 6 (1998) (citing GraphicData, 37 Fed.Cl. at 779–80); see also Cubic II, 37 Fed.Cl. at 350 ("As a practical matter, ... in most bid protests, the 'administrative record' is something of a fiction, and certainly cannot be viewed as rigidly as if the agency had made an adjudi-

---

**2.** This is the second opportunity granted the parties to ventilate this issue. See Defendant's Response to Court's Request for Authority, filed March 16, 1998; Plaintiff's Reply to Defendant the United States' Response to the Court's Request for Authority, filed March 17, 1998; Intervenor's Response to Defendant's Response to Court's Request for Authority, filed March 17, 1998; Defendant's Reply to Plaintiff's Reply to Defendant Response to Court's Request for Authority, filed March 20, 1998.

**3.** In reviewing a procurement decision of a Government agency under the APA standard, the reviewing court will sustain the agency's action unless it is ("arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). 5 U.S.C. § 706(2)(A); see, e.g., W & D Ships Deck Works, Inc. v. United States, 39 Fed. Cl. 638, 640–42 (1997); Delbert Wheeler, 39 Fed. Cl. at 246; GraphicData, 37 Fed.Cl. at 779.

cative decision on a formal record that is then certified for court review."); *Mike Hooks, Inc.*, 39 Fed.Cl. at 156 (to same effect). Thus, in the context of a bid protest, it is the defendant-agency that must, *ex parte* and in contemplation of litigation, "exercise some judgment in furnishing the court with the relevant documents." *Cubic II*, 37 Fed. Cl. at 350; *see also Mike Hooks, Inc.*, 39 Fed.Cl. at 156. Effective judicial review of an agency's exercise of discretion is irreconcilably at odds with the notion that the reviewing court's inquiry must be confined to an administrative record that is likewise the product of the agency's sole discretion.

■ While an agency's technical expertise concerning its unique procurement requirements is entitled to some deference, "the court [of course] must ... perform an *informed* review of even technical decisions in order to meaningfully exercise its jurisdiction." *Redland Genstar, Inc. v. United States*, 39 Fed.Cl. 220, 231 (1997) (emphasis added) (citing *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 910–11 (Fed.Cir. 1988)). In order to preserve meaningful judicial review in bid protest cases, this court has followed certain established and recognized principles of APA jurisprudence which define the circumstances in which the administrative record may be appropriately supplemented, as set out in *Esch v. Yeutter*, 876 F.2d 976 (D.C.Cir.1989):

> (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Id.* at 991 (citations omitted), *quoted favorably in Cubic I*, 37 Fed.Cl. at 342. *See also id.* at 345 (allowing limited discovery); *Cubic II*, 37 Fed.Cl. at 350 (explicating justifications for discovery beyond the administrative record in bid protests); *Mike Hooks, Inc.*, 39 Fed. Cl. at 156 (citing *Cubic II* to this effect); *GraphicData*, 37 Fed.Cl. at 779–80 (following *Cubic II* and adopting *Esch* standard); *Aero Corp.*, 38 Fed.Cl. at 411 (same); *Day & Zimmermann*, 38 Fed.Cl. at 597 n. 6 (noting propriety of *Esch* standard and its adoption in *Cubic I*); *Delbert Wheeler*, 39 Fed.Cl. at 246–47 (following *Cubic II* and permitting discovery).

■ Applying the foregoing principles to the case at bar, it is readily apparent that plaintiff is entitled to conduct reasonable discovery aimed at supplementing the administrative record, which in its present form strongly suggests the Army's conduct of the subject solicitation "is not adequately explained in the record before the court." *Esch*, 876 F.2d at 991. Specifically, with respect to the foregoing, the Army's RFP stated that a competitive range would be determined after the SSEB and PRAG completed their evaluations and scoring of proposals received in this solicitation. According to the RFP, the competitive range "is a subjective determination of the range of point scores and other subjective considerations which have the best potential for being selected for award of this contract." AR 000627. A more comprehensive description of the competitive range and its significance in this solicitation, omitted from the RFP, is supplied by the Army's internal Source Selection Plan, which provides that a proposal shall be deemed to be in the competitive range *unless no real possibility exists* that it could be enhanced sufficiently to have a reasonable chance of award. Moreover, doubtful cases are to be resolved in favor of inclusion within, rather than exclusion from, the competitive range. The Source Selection Plan further provides that the SSEB will evaluate each proposal on the basis of various stipulated criteria and assign said proposal a numerical rating score ranging from zero to 1,000 points. Said range of potential point scores is further broken down into subranges which classify proposals falling within as ei-

ther (i) excellent; (ii) very good; (iii) satisfactory; (iv) marginal; or (v) unacceptable.

Thereafter, based upon the proposal rating scores of each offeror compiled by the SSEB, the SSAC will categorize individual proposals as either (i) acceptable for purposes of further negotiation; (ii) potentially acceptable for negotiations, upon minimal modifications or clarifications; or (iii) unacceptable for negotiation purposes. After the SSAC ranks all proposals in the foregoing manner, the contracting officer is to determine the competitive range, subject to the review and approval of the SSA. Whether additional discussions with offerors or the submission of best and final offers (BAFOs) should precede the determination of the competitive range is also within the contracting officer's discretion. Finally, the Source Selection Plan provides that offerors excluded from the competitive range will be notified of their exclusion *as soon as possible by letter.*

In this solicitation, the foregoing procedures yielded a competitive range which included just a single offeror—Keller/Catellus, defendant-intervenor here—to the exclusion, of course, of the other 14 offerors. A competitive "range" of one as here, in this court's view, merits close judicial scrutiny.[4] Such scrutiny of the administrative record reveals three unexplained inconsistencies, at a minimum, between the solicitation process described in the Source Selection Plan and the manner in which this solicitation actually unfolded.[5] First, six of the offerors *excluded* from the competitive range, plaintiff included, submitted proposals which were classified as "satisfactory" by the SSEB. According to the Source Selection Plan, a "satisfactory" proposal has weaknesses that "can be readily corrected" and, therefore, a fair to good probability of being selected for award.[6] Consequently, it cannot be said that a "satis-

factory" proposal has *no real possibility* of being selected for award, such that the Source Selection Plan permits said proposal's exclusion from the competitive range. As it presently stands, the administrative record contains no explanation of this inconsistency.

Second, the SSAC's report recommends that a competitive range consisting solely of defendant-intervenor be established and, further, that award be made to defendant-intervenor without requesting BAFOs from the offerors at large. Although it fails to categorize the 15 proposals at hand as (i) acceptable, (ii) potentially acceptable, or (iii) unacceptable, in accordance with the requirements of the Source Selection Plan, the SSAC report states in self-serving conclusory fashion that a competitive range of one conforms to said Plan. By way of comparison, the SSEB's interim report equivocates as to the advisability of further discussions with offerors and BAFOs, and makes no firm recommendation concerning the competitive range. Assuredly, it might be well within the SSAC's discretion to undertake even a substantial refinement of the SSEB's findings. That is not to say, however, that the court must acquiesce to the administrative record's failure to set forth with particularity the SSAC's specific reasons for doing so.

Third, the Army failed to notify the 14 unsuccessful offerors of their exclusion from the competitive range until almost *four months* after the date on which the SSAC recommended that the competitive range consisted solely of K/C, and *over three months* after the date on which the Army notified defendant-intervenor of its inclusion in the competitive range. Yet, the Source Selection Plan requires that offerors excluded from the competitive range shall be noti-

---

4. *Cf. Birch & Davis Int'l, Inc. v. Christopher,* 4 F.3d 970, 974 (Fed.Cir.1993); *W & D Ships,* 39 Fed.Cl. at 643; *Rockwell Int'l Corp. v. United States,* 4 Cl.Ct. 1, 5 (1983).

5. In response to plaintiff's discovery requests and paragraph 4 of the court's order dated March 16, 1998, the Government has filed 11 bound volumes of additional documents relating to this solicitation, but omitted from the administrative

record, for the court's *in camera* examination. Said documents number over 4,000 pages. Even assuming that the court's *in camera* examination reveals rational explanations for the apparent irregularities noted herein, this circumstance alone would validate the need for reasonable discovery beyond the administrative record.

6. AR 000729.

fied *as soon as possible.*[7] The administrative record fails to explain why the circumstances of this solicitation caused the phrase "as soon as possible" to mean a delay of three to four months. Furthermore, roughly one month after the Army notified defendant-intervenor of its inclusion in the competitive range, the Army asked the other 14 offerors, without any explanation whatever, to extend the acceptance period of their offers 60 days, until late October of 1997. Of these 14 offerors, at least 13, plaintiff included, complied with the Army's request. What the Army did, in essence, was secure the consent of the unsuccessful offerors to extend the acceptance period of their offers, without informing said offerors that, *at least one month beforehand,* defendant-intervenor's proposal had been selected as *the only* competitive range. No justification for the Army's decision to withhold this information appears within the administrative record.

In sum, the foregoing circumstances compel this court to reject the Army's campaign to make a fortress of the administrative record in these proceedings. Unexplained irregularities of this nature clearly and justifiably make out a prima facie case for the supplementation of the administrative record. To achieve this end, limited discovery is an imperative.

### B. *Scope of Permissible Disclosure to Plaintiff*

We acknowledge, of course, that discovery must be suitably limited in order to ensure that plaintiff is not granted an undue competitive advantage, relative to other offerors, in the event of a resolicitation of the Fort Car-

son project, or in future solicitations for other projects of similar nature. For this reason, the court's Order dated March 23, 1998, at this posture, limits the scope of *plaintiff's discovery* to the unanswered questions surrounding the Army's evaluation of *plaintiff's proposal.* It is, moreover, the court's intention that counsel for plaintiff shall be, and is hereby, permitted to share with its client the fruits of said discovery, as well as information already within the administrative record relating to the Army's evaluation of plaintiff's proposal, subject to the restriction that under no circumstances shall counsel for plaintiff disclose *any* information relating to proposals submitted by offerors other than plaintiff.[8] Needless to say, in the interests of fairness the subject Order similarly grants defendant-intervenor precisely the same limited discovery privileges. As a result, neither plaintiff nor defendant-intervenor enjoys an advantage relative to the other for purposes of this litigation and discovery pursuant thereto.

Nor are we persuaded that in the case of a future solicitation for another project of similar nature, plaintiff would enjoy a meaningful competitive advantage over the other offerors participating in the Fort Carson solicitation. This is so because, according to the Army's Source Selection Plan, unsuccessful bidders on the Fort Carson project are to be debriefed *after* award, which circumstance will tend to level the playing field. Thus, the court sees no material distinction between the information normally made available to an offeror in a post-award debriefing and the information to be made available to plaintiff pursuant to the subject Order.[9] We are also doubtful that knowledge concerning the

---

**7.** *Cf.* 48 C.F.R. §§ 15.609(c), 15.1002(b) (1996). Admittedly, the instructive quality of the foregoing provisions of the Federal Acquisition Regulation (FAR) must be considered in light of the fact that defendant and defendant-intervenor, in their pending dispositive motions, emphatically deny the FAR's applicability to this solicitation. By this opinion, addressed to the narrow issue of the proper scope of discovery, the court does *not* reach the question of whether the FAR governs this solicitation. It is, however, noteworthy that the Source Selection Plan and related Army memoranda unequivocally state that the Plan was prepared and approved in accordance with Subpart 15.6 of the FAR. *E.g.,* AR 000701, 000717.

**8.** *Cf.* 48 C.F.R. § 15.1004(d)-(e) (1996) (listing permissible and impermissible subjects for post-award debriefing of an unsuccessful offeror). Although technically inapplicable to solicitations issued prior to January 1, 1997, provisions of the FAR relating to *pre-award* debriefings delineate between permissible and impermissible subjects in like manner. *See* 48 C.F.R. §§ 15.1005(e), 15.1006(e) (1997).

**9.** *See* 48 C.F.R. § 15.1004(d)-(e) (1996); 48 C.F.R. § 15.1006(d)-(e) (1997).

Army's evaluation of plaintiff's proposal, which relates uniquely to the Fort Carson project, can be molded into a significant competitive advantage in future solicitations for military housing projects in different locales, due to regional differences in climate, construction methods, labor force, and other indigenous variables.

■■■ Asserted opposition to the foregoing by "good cause shown" for a protective order pursuant to RCFC 26(c) requires, at a minimum, "a particularized showing that the information sought to be protected is *confidential commercial information.*" *Wall Industries, Inc. v. United States*, 5 Cl.Ct. 485, 487 (1984) (emphasis added and emphasis in original omitted). Here at bar, the only "confidential commercial information" plaintiff will gain access to is information *relating to its own proposal,* inasmuch as the subject Order denies plaintiff access to any and all information relating to the proposals of other offerors.[10] Consequently, it is clear that discovery in this case shall *not* be used as a vehicle for the acquisition of proprietary information and trade secrets of other offerors.[11]

Given the foregoing, the only arguable justification for denying plaintiff access, on this record, to information concerning the Army's evaluation of plaintiff's *own* proposal is the possibility that plaintiff would thereby secure a competitive advantage in a *resolicitation* of the Fort Carson project.[12] Defendant and defendant-intervenor fail to explicate why the limited, safeguarded discovery contemplated by the court's Order of March 23, 1998, would imperil a future resolicitation, apart from making vague assertions of dire consequences. Such arguments are unavailing when a protective order under RCFC 26(c) is sought, for "it is axiomatic that nebulous and conclusory allegations of confidentiality and business harm are insufficient to carry the movant's burden." *Wall Industries,* 5 Cl.Ct. at 487. Neither defendant has proffered any "specific examples of substantial resulting harm or injury to the party movant." *Id.* Instead, the Government and defendant-intervenor cite statutes, regulations and case law which are inapposite and unhelpful to their cause.

■■■ The Government argues, for example, that the Procurement Integrity Act, 41 U.S.C. § 423, prohibits the release of the information in question to any representative of plaintiff, except counsel, even during the pendency of a bid protest before this court.[13] We disagree, for the Government neglects to mention that the Act prohibits not *all* disclosure of procurement-related information, but rather, disclosure *"other than as provided by law."* 41 U.S.C. § 423(a), (b) (emphasis added). Nothing in the Act or its legislative history remotely suggests an intention on the part of Congress to restrict the information to which a bid protester is ordinarily entitled by means of discovery for litigation purposes, or to otherwise circumscribe this court's authority to administer pre-trial proceedings in bid protests.[14] Similarly, the Government

---

10. *Counsel* for plaintiff will, of course, have access to such information.

11. *See* Order filed March 23, 1998, ¶ 3. Upon clear proof, any violation of this cardinal directive will result in the imposition of appropriate sanctions.

12. Indeed, should the Government and defendant-intervenor prevail on the merits (as opposed to defeating plaintiff in the preliminary stages of pretrial discovery), there will be no further competition regarding the Fort Carson project in which plaintiff could exercise its purported "competitive advantage." Defendant-intervenor concedes that it would suffer no harm if the Army's evaluation of plaintiff's proposal is disclosed to plaintiff itself and the court ultimately sustains the pending award. Transcript, Hearing of March 20, 1998, at 23.

13. Section 423 was originally enacted as part of the Office of Federal Procurement Policy Act Amendments of 1988, Pub.L. 100–679, § 6, 102 Stat. 4063 (Nov. 17, 1988), and underwent substantial revision pursuant to the (Clinger–Cohen Act of 1996, Pub.L. 104–106, § 4304, 110 Stat. 659 Feb. 10, 1996).

14. *See* S.Rep. No. 100–424, 100th Cong., 2d Sess. (July 8, 1988), *reprinted at* 1988 U.S.C.C.A.N. 5687; H.R.Rep. No. 100–911, 100th Cong., 2d Sess. 18–24 (Sep. 9, 1988); H.R. Conf. Rep. No. 104–450, 104th Cong., 2d Sess. (Jan. 22, 1996) (1996 amendments to 41 U.S.C. § 423), *reprinted at* 1996 U.S.C.C.A.N. 238, 454–55. The actual statutory language finally enacted in 1988 was not the subject of committee hearings, or agency and public comment, because said language represented an eleventh-hour compromise reached by House and Senate

cites, and we have found, no precedent construing § 423 to this effect. Quite the contrary, the Act's savings clause clearly and expressly states, in relevant part, that § 423 "does not ... limit the applicability of any ... *remedies* established under any other law or regulation." 41 U.S.C. § 423(h)(7) (emphasis added). Consequently, § 423, properly understood, is obviously directed at situations in which a present or former government procurement officer secretly leaks information concerning a pending solicitation to an offeror participating therein, in the hopes of securing post-government employment or other compensation from said offeror. § 423(c), (d).[15] It is clear beyond cavil,

therefore, that no wrongful disclosure of procurement information "other than as provided by law" is threatened here. Rather, plaintiff seeks only to obtain information that is indisputably relevant to the merits of the theory of its case by lawful means—the discovery that is presumptively available to every litigant pursuant to this court's rules, *e.g.*, RCFC 26(b)(1).[16] Only if the Government carries its burden under RCFC 26(c) will this court enter a protective order barring plaintiff's representatives, counsel aside, from access to information otherwise properly discoverable. The Government's bland, hospitable citation of the Procurement Integrity Act fails to discharge said burden.[17]

prior to adjournment of the legislative session. 134 Cong. Rec. 31690 (Oct. 19, 1988) (statement of Sen. Levin).

**15.** Summarizing the purpose of the Procurement Integrity Act, Senator Glenn stated:

This bill is intended to break the back of the "old-boy" network where information and favors are given to contractors, often via consultant intermediaries, in an effort to provide individual competing corporations with an unfair advantage over their more scrupulous competitors. In exchange for those favors, bribes, gratuities, and promises for future employment opportunities are made to Government personnel.

134 Cong. Rec. 32156 (Oct. 20, 1988); *see also* H.R.Rep. No. 100–911, *supra*, at 18 ("[I]t is hard for government negotiators to remain independent and objective when they are being wined, dined, and offered lucrative jobs by contractor personnel."); *id.* at 20 (Act's purpose described as the abatement of "insider trading of sensitive procurement information"); 134 Cong. Rec. 23590 (Sep. 13, 1988) (statement of Rep. Horton that Act is intended to combat "procurement fraud and abuses"). Scholarly commentators agree that procurement scandals prompted Congress to enact the Act. *See* Jonathan S. Feld, *Thou Shalt Not Disclose: How the New Laws Will Bring Integrity to the Government Procurement Process*, 4 ABA Crim. Justice 14, *passim* (Winter 1990); Howard W. Cox, *FASA and False Certifications: Procurement Fraud on the Information Superhighway*, 25 Pub. Cont. L.J. 1, 11 (1995); Comment, *Section Six of the Office of Federal Procurement Policy Act Amendments of 1988: A New Ethical Standard in Government Contracting?*, 20 Cumb. L.Rev. 421, 426 (1990).

**16.** We find it especially curious, moreover, that the Government strives to use the Procurement Integrity Act to block a bid protester's lawful access to the fruits of pre-trial discovery, a subject on which the Act is utterly silent, when the Act *expressly* places an impressive array of pow-

erful administrative, civil, and criminal enforcement mechanisms at the Government's disposal. *See* 41 U.S.C. § 423(e). "If these remedies are insufficient, the responsibility for stronger measures lies with Congress. The court is ill-suited to the task." *Central Arkansas Maintenance, Inc. v. United States*, 68 F.3d 1338, 1343 (Fed.Cir. 1995) (citing 41 U.S.C. § 423(h)-(j) (1995), *recodified as amended at* 41 U.S.C. § 423(e)).

**17.** Not once, but *twice*, the Government has cited the Act as supportive authority, in plain contravention of this court's instructions. On March 13, 1998, the court directed the Government to provide "pointed authorities, not broad generalities," in support of its position, meaning "pointed, focused, *obligatory* authorities." Transcript, Hearing of March 13, 1998, at 124 (emphasis added). In response the Government stated, without elaboration, that "[t]he Procurement Integrity Act, 41 U.S.C. § 423(a) and (b), prohibits the disclosure of procurement information." Defendant's Response of March 16, 1998, *supra*, at 3–4. Thereafter, the court directed the parties to further ventilate the disclosure issue by submitting written statements of their respective positions, accompanied in each case by an appendix "contain[ing] the cases, *statutes*, regulations, or other authorities relied upon, *with the operative language underscored*." Order filed March 24, 1998 (emphasis added). Again the Government cited § 423, but neglected to attach the text of the statute "with the operative language underscored" in accordance with the court's directive. Defendant's Response of March 26, *supra*, at 5. It is sufficient to say, at this posture, that the Government's unexplained noncompliance exposes the fundamental weakness of its argument concerning the applicability of § 423, and likewise undermines the Government's citations of the implementing regulations thereunder. Defendant's Response of March 16, 1998, *supra*, at 3–4 (citing 48 C.F.R. §§ 3.104–2 through 3.104–5 (1997); 48 C.F.R. §§ 15.411(b), 15.413(a) (1996)).

Turning to case law, the Government and defendant-intervenor rely mainly upon *Metric Systems Corp. v. United States*, 13 Cl.Ct. 504 (1987), a pre-award case in which this court prohibited the plaintiff's counsel from releasing certain information to its bid protester client. In summarizing the terms of its protective order, the *Metric* court stated:

> Accordingly, the court concludes that information Metric would routinely receive if it were in the competitive range will be disclosed without limitation. Information within the executive privilege as described herein will not be disclosed; nor will any information relating to other bidders. Information in the evaluation reports, the initial evaluation results briefing, and the competitive range determination (as redacted by the court) will be furnished for review only by counsel of record for Metric[.] ... The following documents will be reviewed by the court only: the source selection plan ("SSP"); the evaluation reports worksheets, and the initial evaluation analysis report.

*Id.* at 507. Here at bar, the court's Order of March 23, 1998 contemplates a disclosure of solicitation information substantially resembling the disclosure authorized in *Metric*, since plaintiff is granted access to neither the Army's Source Selection Plan nor "any information relating to other bidders," *id.*, including but not limited to the proposals of competing bidders and the Army's evaluation of said proposals.[18] Therefore, in comparing the subject Order with the terms of the protective order approved in *Metric*, the sole relevant distinction is that in the present case, plaintiff shall be allowed to examine the Army's evaluation of *its* own proposal. This limited disclosure, in our view, represents, on this record, an exceedingly modest step beyond *Metric*, where it was held that "information [the protester] would routinely receive if it were in the competitive range [would] be *disclosed without limitation*." *Id.* (emphasis added).

Particularly noteworthy is the deliberate care with which Judge Bruggink qualified his ruling in *Metric*, stating that "no single rule can be adopted generically covering discovery requests in these circumstances." *Id.* With this undeniable principle in mind, we find that in at least three significant respects, the circumstances in *Metric* favored or required somewhat stricter limits on the disclosure of procurement information than are necessary and appropriate in the case at bar. First, the *Metric* court's ruling was based in part upon Secretary of the Air Force's meritorious assertion of executive privilege. *Id.* at 506–07. Conversely, here the Government makes no assertion of executive privilege. Second, the dispute in *Metric* centered upon innovative but seemingly unproven technology, *i.e.*, an "unmanned threat emitter" (UMTE). *Id.* at 504, 506. This nomenclature, as well as the aforesaid assertion of executive privilege, suggests the UMTE was a device of tactical significance, implicating *concerns of national security*. The case at bar, on the other hand, involves commonplace "bricks and mortar" residential construction. Moreover, as repeatedly stressed herein, *supra*, plaintiff is entitled to no disclosure of any other offeror's proprietary information. Third, as plaintiff correctly observes, but the defendants studiously ignore, Federal procurement law took a far more austere approach to the disclosure of competitive solicitation information to offerors in 1987, when *Metric* was decided. Since that era, Government procurement policy has steadily progressed toward a more visible solicitation process, as evidenced by Congress's authorization of post-award and pre-award debriefings of offerors in 1994 and 1996, respectively.[19] In sum, therefore, we

---

**18.** Unlike the situation in *Metric*, here the defendants concede that *counsel* for plaintiff is entitled to the contents of the administrative record, as well as the results of such discovery as the court may authorize. *See* Defendant's Response of March 16, 1998, *supra*, at 4; Defendant's Response of March 26, 1998, *supra*, at 5; Intervenor's Response of March 17, 1998, supra, at 1 (concurring with "the Government's statement of the applicable law"); Intervenor's Statement of

Position Concerning the Propriety of Interlocutory Appeal, filed March 30, 1998, at 1 ("Outside counsel for Plaintiff that are admitted under a protective order could have access to the information.").

**19.** *See* Pub.L. 103–355, § 1014(2), 108 Stat. 3243, 3255 (1994), *codified at* 10 U.S.C. § 2305(b)(5) (1994) (post-award debriefing); Pub.L. 104–106, § 4104, 110 Stat. 644 (1996),

are constrained to hold that the foregoing considerations all demonstrate that the limited disclosure permitted by this court's Order of March 23, 1998 is hardly irreconcilable with *Metric.*

More to the point for present purposes, the *Metric* court carefully balanced the protester's interest in access to solicitation information for litigation purposes against the Government's assertion of executive privilege and the confidentiality interests of the other offerors in the solicitation. *Id.* at 505–06. Such a balancing of interests is required whenever a party seeks to overcome the presumption of open proceedings in American courts,[20] whether by protective order, assertion of privilege, or other means. *See, e.g., United States v. Nixon,* 418 U.S. 683, 703–13, 94 S.Ct. 3090, 3105–10, 41 L.Ed.2d 1039 (1974) (rejecting claim of absolute executive privilege claim in favor of analysis balancing the public interest in the administration of criminal justice and compulsory process for the production of evidence against the President's interests in confidential communications and the separation of powers). Likewise, under RCFC 26 and its counterpart, Federal Rule of Civil Procedure 26, courts resolve discovery disputes not on the basis of bright-line rules, but rather, by employing a flexible balancing analysis. *See, e.g., Anker v. G.D. Searle & Co.,* 126 F.R.D. 515, 519 (M.D.N.C.1989)

(motion to compel discovery requires balancing test that "weighs the need for discovery by the requesting party and the relevance of the discovery to the case against the harm, prejudice or burden to the other party."); *Wall Industries,* 5 Cl.Ct. at 487–88 (balancing movant's justifications for protective order against the public interest in access to evidence). Thus, courts craft protective orders to meet the singular needs of each individual case, guided by the venerable principle that "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Nixon,* 418 U.S. at 710, 94 S.Ct. at 3108. *See also U.S. Steel Corp. v. United States,* 730 F.2d 1465, 1468 (Fed.Cir.1984) ("Meaningful increments of protection are achievable in the design of a protective order. It may be that particular circumstances may require specific provisions in such orders."). In short, every protective order is *sui generis,* the product of a unique balancing of competing interests viewed against the totality of the circumstances.[21]

In balancing the aforesaid interests here at bar, the court must weigh plaintiff's interest in having its business personnel examine the Army's evaluation of plaintiff's own proposal against the possibility that such disclosure would give plaintiff a competitive advantage in a resolicitation of the Fort Carson project.

codified at 10 U.S.C. § 2305(b)(6) (pre-award debriefing).

20. *See* 28 C.F.R. § 50.9 (Department of Justice policy acknowledging the "vital public interest in open judicial proceedings" and the "strong presumption against closing proceedings or portions thereof"); John Gibeaut, *Secret Justice,* 84 A.B.A. Journal 50 (April 1998) (analyzing how trend toward closed proceedings and sealed records is subject to mounting criticism, typically on the ground that "such practices erode public oversight and confidence in the system, and reduce accountability for some protected wrongdoers").

21. For this reason, the other cases on which the Government and defendant-intervenor rely are either flatly inapposite or entitled only to nonobligatory precedential weight. *U.S. Steel, supra,* and *Akzo, N.V. v. United States Int'l Trade Commission,* 808 F.2d 1471 (Fed.Cir.1986), had nothing to do with bid protests. Moreover, all of the cases in question involved the disclosure of proprietary information or trade secrets belonging to *private parties* or, in one instance, the Govern-

ment's overall ranking of competing offerors, none of which shall be disclosed to plaintiff here at bar. *See U.S. Steel,* 730 F.2d at 1466–67 (controversy over disclosure of proprietary information between steel companies engaged in trade dispute); *Akzo,* 808 F.2d at 1482 (protective orders relating to "the private parties' confidential information" in cross-border patent litigation); *Hydro Engineering, Inc. v. United States,* 37 Fed.Cl. 448, 454–55 (1997) (pre-award bid protest, peripheral discussion of protective order safeguarding proprietary information from disclosure between competing offerors and certain of their representatives); *M.W. Kellogg Co./Siciliana Appalti Costruzioni, S.p.A. v. United States,* 10 Cl.Ct. 17, 18 (1986) (pre-award bid protest, passing reference to protective order entered "to prevent the disclosure of confidential information gained through relatively unrestricted discovery"); *id.* at 26 (finding that no disclosure of information relating to the overall ranking of offerors had violated integrity of procurement).

Further, the court must also factor into the equation plaintiff's entitlement to fundamental procedural due process, which entitles it to the opportunity to discover nonprivileged relevant and material evidence indispensable to the proof of the merits of its case.

■ As to plaintiff's stake in this litigation, the Government and defendant-intervenor contend that plaintiff lacks standing to bring this bid protest on the ground that plaintiff, as the sixth-ranked offeror, cannot demonstrate that it would have had a substantial chance of receiving the award. This is so, even if the solicitation is shown to have been tainted by wrongful conduct on the part of the Army and defendant-intervenor. Conversely, plaintiff persuasively argues that it obviously cannot rebut the aforesaid contention without the probative evidence establishing that it would have had a reasonable chance of award had its proposal been fairly evaluated by the Army. Stated differently, counsel cannot fully develop and effectively present such probative evidence without the full assistance of plaintiff's business personnel, according to plaintiff, because "the person best able to assess and analyze the government's evaluation of its proposal and testify thereon is the Plaintiff who has prepared the extensive proposal and is the only one knowledgeable about the details therein." Plaintiff's Written Statement of Position, filed March 26, 1998, at 5. The court agrees that it is most probable that plaintiff's case hinges, in all likelihood, upon whether counsel is free to seek the *informed* consultation of plaintiff's business personnel. Therefore, plaintiff's interest in having its business personnel examine the Army's evaluation of plaintiff's proposal is unquestionably entitled to our most solemn consideration.[22]

Turning now to the defendants' common interest in preventing plaintiff from wielding a competitive advantage, the court acknowledges defendant-intervenor's contention that it would have the most to lose in a resolicitation.[23] The gravamen of defendant-intervenor's argument is that because its proposal achieved the highest ranking in the solicitation currently pending, it has the least potential for enhancement and might well be overtaken by another offeror's proposal. We are unconvinced that defendant-intervenor's position in a resolicitation would necessarily be so precarious. Inasmuch as, on this record, its original ranking fell well short of the maximum 1,000 points, defendant-intervenor's proposal has ample leeway for improvement. Moreover, the court's Order of March 23, 1998, maintains plaintiff and defendant-intervenor on an equal competitive footing, since both litigants are entitled to examine the Army's evaluations of their respective proposals.

Respecting plaintiff's competitive posture relative to other offerors in a resolicitation, during the hearing of March 20, 1998, the court inquired as to whether the Army could level the playing field by providing each offeror with the same information, *i.e.,* knowledge relating solely to the evaluation of that offeror's own former proposal.[24] In reply, the Government conceded that such an approach has merit, but expressed concern that

---

22. The contract to be awarded, pursuant to this solicitation, involves the renovation, construction, and management of over 2,600 residential rental units. Performance of this contract is expected to span decades. Counsel for plaintiff can hardly be expected to competently prepare plaintiff's case if he cannot openly communicate with his client and rely upon plaintiff's peculiar expertise in these areas. There is no indication that counsel for defendant-intervenor has so far labored under similar restrictions, where, as here, the administrative record clearly indicates that the Army and defendant-intervenor have carried on extensive discussions regarding certain undefined "Contract Management Procedures" since defendant-intervenor was named the sole occupant of the competitive range in July of 1997.

23. Transcript, Hearing of March 20, 1998, at 22–23, 25. We assign little or no weight, however, to defendant-intervenor's objection that "the very act of reprocuring" will cause it to be "harmed by having to compete again and attempt to rewin what it already has won." Defendant–Intervenor's Statement of Position Concerning the Propriety of Interlocutory Appeal, filed March 30, 1998, at 2–3. In *every* bid protest case, the proposed awardee is potentially subject to competitive risk *if* the protester prevails on the merits.

24. Transcript of Hearing of March 20, 1998, at 5–10.

a former offeror participating in the resolicitation could enjoy a competitive advantage relative to a new offeror. The court is unpersuaded, however, that the Government's hypothetical resolicitation dilemma would prove intractable. Regardless of whether each former offeror is provided with information regarding the evaluation of its former proposal, such offerors would already possess certain natural advantages, due to ordinary learning curve effects, over new offerors. Furthermore, it is not clear that the competitive asymmetry posited by the Government differs materially from the situation in which the original solicitation involved the inclusion of multiple offerors in the competitive range, discussions between the Government and each such offeror, and the ultimate submission of BAFOs.[25] Upon a resolicitation, former offerors who participated in such discussions and submitted BAFOs will, all other things being equal, tend to have an inherent advantage not only over new offerors, but also those former offerors who were excluded from the original competitive range.

Thus, in a resolicitation following a successful bid protest, one would rarely expect that each and every offeror possesses materially equivalent competitive information. The obvious solution is that the procuring agency must craft a new RFP that communicates to all offerors, new or old, the lessons learned by all participants in the first solicitation. No doubt there is a certain degree of inconvenience associated with revising an RFP in this manner, due to the countervailing need to safeguard truly proprietary information. In the present case, however, any concerns over inconveniences visited upon the Army as a consequence of a hypothetical resolicitation must yield to the practical realities of bid protest litigation.

Stripped to its essentials, the position of the Government and defendant-intervenor is that counsel for plaintiff must be made the agent of his client's opponents, charged with the duty of making certain plaintiff can prepare its case solely from evidence of its opponents' choosing. Absent grounds far more compelling than the arguments raised by the Government and defendant-intervenor, fundamental procedural due process constrains this court from pitting counsel for plaintiff against his client in this manner. Carried to its logical extreme, the position taken by the Government and defendant-intervenor implies the absurd conclusion that discovery is never allowable to a bid protester appearing *pro se* in this court against the defendant's arguments. Such a result simply defies reason, of course—*pro se* litigants are indisputably entitled to discovery and the fruits thereof, and no responsible person would aver to the contrary. Rather than being penalized for its decision to retain counsel in this protest, plaintiff should be put in no worse position than the *pro se* protester.[26]

---

25. *Cf.* 48 C.F.R. §§ 15.610, 15.611 (1996) (procedures for discussions with offerors in competitive range and submission of BAFOs).

26. The Government submits that information pertinent to the Army's evaluation of plaintiff's proposal should be released, if at all, only to a representative of plaintiff who certifies that he or she will not be involved in any competitive decisionmaking regarding the solicitation or resolicitation of the Fort Carson project. Defendant's Response of March 26, 1998, *supra*, at 6. We acknowledge that, in some circumstances, a protective order may properly utilize "involvement in 'competitive decisionmaking' as a basis for denial of access" to information. *U.S. Steel,* 730 F.2d at 1468 n. 3. For example, in-house counsel who have no involvement in competitive decisionmaking could be granted access to certain sensitive proprietary information. *Id.* at 1468–69. However, we are not satisfied that the foregoing approach is properly suited to the present case. Limiting access to selected in-house counsel might be a workable solution in the insulated departmental structure of a vast multinational corporation such as U.S. Steel, but there is no suggestion here that plaintiff resembles U.S. Steel in terms of either size or organizational structure. Furthermore, as noted herein, *supra,* plaintiff has a weighty interest in ensuring that its outside legal counsel is free to seek the *informed* consultation of plaintiff's business personnel. This interest is absolutely defeated if the Army's evaluation of plaintiff's proposal is made available only to persons in plaintiff's organization who exercise no meaningful responsibility with respect to said proposal.

The court is also constrained to observe that the Government's advocacy of an arrangement similar to that described in *U.S. Steel* further undermines its argument, *supra,* that the Procurement Integrity Act, 41 U.S.C. § 423, forms an impenetrable barrier to the disclosure of any information pertinent to a pending solicitation.

Again, due process clearly demands that plaintiff be informed of the specific grounds on which its proposal was deemed unworthy by the Army. Only then can plaintiff fairly attempt to shoulder its burden of proof.

## C. *Propriety of Interlocutory Appeal*

█ Perhaps in the hope of dissuading our ruling today, the Government and defendant-intervenor have warmly signalled their intention to seek interlocutory appeal of any order granting plaintiff's representatives, other than counsel, access to the Army's evaluation of plaintiff's own proposal. The court may, of course, certify the foregoing issue for interlocutory appeal if, and only if: (i) said issue presents a controlling question of law; (ii) there is a substantial ground for difference of opinion with regard to said issue; *and* (iii) it is possible that an immediate appeal from the court's ruling on said issue will materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(d)(2); *Northrop Corp. v. United States,* 27 Fed.Cl. 795, 799 (1993); *Brown v. United States,* 3 Cl.Ct. 409, 411–12 (1983). Because the issues decided by this opinion involve narrow, non-dispositive questions of pretrial procedure, none of the three conjunctive criteria for certification of an interlocutory appeal is satisfied here.

No controlling question of law is presented by the disclosure of the Army's evaluation of plaintiff's proposal, and none other, to plaintiff's business personnel. "Questions of law have only been deemed 'controlling' under [§ 1292(d)(2) ] if they *materially* affect issues remaining to be decided in the trial court." *Brown,* 3 Cl.Ct. at 411 (emphasis added) (citations omitted), *followed in Northrop,* 27 Fed.Cl. at 799. While plaintiff no doubt views access to the information in question as important to the preparation of its case, at this premature stage of the litigation it would be reckless to conclude that plaintiff can use said information to materially advance the merits of its case. Certainly the Government and defendant-intervenor have failed to make any showing to this effect.[27]

Absent some convincing assurance that a controlling question of law is presented, the court need not reach the question of whether there are substantial grounds for difference of opinion with respect to a purely hypothetical "controlling question of law." *Brown,* 3 Cl.Ct. at 412.[28] Even assuming the first two criteria of § 1292(d)(2) are satisfied, there is virtually no possibility that an immediate appeal of any question decided herein will materially advance the ultimate termination of this litigation. In the unlikely event that the Government and defendant-intervenor were to prevail in an interlocutory appeal, counsel for plaintiff would remain entitled to present evidence relating to the Army's evaluation of plaintiff's proposal, albeit without the preparatory assistance of plaintiff's business personnel, at a trial on the merits. *Brown,* 3 Cl.Ct. at 412, *Northrop,* 27 Fed.Cl. at 800. Moreover, although either the Government's pending motion for judgment on the administrative record or defendant-intervenor's pending motion for summary judgment could, if sustained, dispose of this case without trial, the substantive questions of law presented therein are entirely separate and distinct from the procedural questions decided here. *Brown,* 3 Cl.Ct. at 412. Simply put, inasmuch as the court decides no *dispositive* question today, it is inconceivable that an interlocutory appeal will hasten the conclusion of this bid protest. On the contrary, interlocutory appeal in the present circumstances "would create unnecessary delay and expense as well as piecemeal litigation, and thus contrast directly with the third statutory criterion of section 1292(d)(2)." *Northrop,*

---

**27.** No doubt the Government and defendant-intervenor have sound tactical reasons for limiting their arguments in favor of interlocutory appeal to what is tantamount to mere conjecture. Any substantial contention that the information in question will materially affect the outcome on the merits would place the defendants' pending dispositive motions at risk.

**28.** Even so, the court takes pain to note that *substantial* grounds for difference of opinion are unlikely to exist, given our conclusion, *supra,* that the Government and defendant-intervenor have failed to carry their burden of establishing "good cause shown" for a protective order pursuant to RCFC 26(c), at least so far as the disclosure of the Army's evaluation of plaintiff's proposal to plaintiff's business personnel is concerned.

27 Fed.Cl. at 801; *see also Brown,* 3 Cl.Ct. at 412. Accordingly, we decline to certify any issue decided by this opinion for interlocutory appeal.

## CONCLUSION

For all of the foregoing reasons, we hold that plaintiff and defendant-intervenor are entitled to limited discovery consistent with paragraphs 1 and 2, respectively, of the court's Order dated March 23, 1998. Therefore, the court's Order of March 30, 1998, staying said discovery until further notice, is hereby VACATED. As provided in paragraph 5(C) of the Order dated March 23, 1998, said discovery *"shall proceed unimpeded and with all due [deliberate] speed."* Counsel for plaintiff may disclose to plaintiff's business personnel the Army's evaluation of plaintiff's proposal, consisting of the documents located at pages AR 000971 through AR 000992, inclusive, of the administrative record. Likewise, counsel for defendant-intervenor may disclose to defendant-intervenor's business personnel the Army's evaluation of defendant-intervenor's proposal, consisting of the documents located at pages AR 0001150 through AR 0001171, inclusive, of the administrative record. Upon application to the court and a particularized showing of reasonable necessity, counsel for plaintiff and counsel for defendant-intervenor may, in the court's discretion, be granted permission to disclose additional information contained within the administrative record,[29] consistent with the foregoing, to their respective clients. In accordance with the terms of paragraph 3 of the Order dated March 23, 1998, counsel shall disclose to plaintiff and defendant-intervenor *no* information relating to proposals other than each party's own proposal. Lastly, the Government and de-

fendant-intervenor shall jointly prepare a revised draft protective order, containing terms not inconsistent with this Opinion, and shall file same with the court for its approval, with a copy to plaintiff, no later than Thursday, April 9, 1998.

IT IS SO ORDERED.[30]

### *APPENDIX A*

In the United States Court of Federal Claims

No. 98–147C

(Filed: March 23, 1998)

---

29. Concerning the documents not within the administrative record that have been submitted by the Government and defendant-intervenor for the court's *in camera* inspection, an appropriate order shall shortly issue.

30. In permitting discovery to proceed in the manner described above, we express no opinion concerning the merits of the pending dispositive motions filed by defendant and defendant-intervenor. While the need for discovery demonstrated here suggests the existence of genuine issues of fact, it remains to be seen whether said factual

issues are *material* to the outcome of this case. Once plaintiff has had a fair opportunity to conduct limited discovery regarding the evaluation of its proposal by the Army, and to thereby mount meaningful opposition to the pending dispositive motions, an opinion deciding said motions shall issue in due course. Nothing from the foregoing should be taken as an indication of any prospective opinion(s) by the court with respect to the ultimate decisions on either the dispositive motions or the trial on the merits.